2002 WY 48

**Jay C. ALLEN, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 00–192.

Supreme Court of Wyoming.

April 2, 2002.

Sylvia L. Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Assistant Appellate Counsel, Representing Appellant.

Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Kimberly A. Baker, Senior Assistant Attorney General, Representing Appellee.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] In December 1999, a jury found appellant, Jay C. Allen, guilty of two counts of aggravated vehicular homicide in violation of Wyo. Stat. Ann. § 6–2–106(b) (LexisNexis 2001), and the district court sentenced appellant to serve 150 to 240 months in prison for each count, the sentences to run consecutively. Appellant appeals from that judgment and sentence, arguing that the district court erred in not suppressing evidence of appellant's blood-alcohol concentration, that appellant's defense counsel was ineffective in several respects, that the district court erred in not appointing a different attorney to represent appellant, that the evidence was insufficient to convict appellant of the charge relating to victim Mary Fink, that certain hearsay testimony should not have been permitted at trial, and that the district court should have declared a mistrial after appellant was cross-examined regarding a prior criminal conviction. We affirm.

## ISSUES

[¶ 2] Appellant phrases the issues on appeal as follows:

I. Did the trial court err in refusing to suppress the results of the blood alcohol test performed on appellant, as implied consent procedures were not followed, and the failure to follow such procedures violated appellant's Fourth Amendment rights?

II. Did the trial court err in refusing to appoint different counsel for appellant, resulting in a violation of appellant's Sixth Amendment right to counsel?

III. Did appellant receive ineffective assistance of counsel?

* * *

IV. Was the evidence insufficient to support a finding of guilty with regard to the charge of aggravated homicide by vehicle pertaining to Mary Fink?

V. Did the trial court err in not ordering a judgment of acquittal as to the charge of aggravated homicide by vehicle pertaining to Mary Fink?

VI. Did the trial court err in permitting hearsay testimony of Heather Johnson?

VII. Did the trial court abuse its discretion when it failed to declare a mistrial or properly instruct the jury after the prosecutor questioned appellant about a conviction more than ten years old?

The State of Wyoming, as appellee, phrases the issues in substantially the same manner.

## FACTS

[¶ 3] On April 14, 1999, just prior to 3:00 p.m., appellant was driving a 1979 station wagon that collided with a Ford Tempo driven by Mary Fink near the intersection of Wyoming Boulevard and McKinley Street in Natrona County. Appellant's brother, Frank Allen, the brother's girlfriend, Heather Johnson, and appellant's unrestrained three-year-old nephew were passengers in the station wagon. Mary Fink's husband, Albert Fink, was a passenger in the Ford Tempo.

[¶ 4] Linda Evans, a certified nurse's aide, was one of the first passersby to stop and assist at the scene. Albert Fink was experiencing difficulty breathing and Mary Fink's foot hurt. Mary Fink told Linda Evans that the station wagon "had pulled in front of them and she couldn't stop" and at some point, appellant added, "I'm so sorry. I didn't see them." Linda Evans could smell a strong odor of alcohol on appellant's

breath, appellant seemed to be "stumbling a little bit," his speech was "a little slurred," and he had bloodshot eyes. Tina Evans, Linda Evans' sixteen-year-old daughter, echoed her mother's observations of appellant and recalled Heather Johnson stating that she told appellant to "watch out for that car."

[¶ 5] A fireman who responded to the collision spoke with appellant at the scene. He could "smell alcohol" on appellant, noticed that appellant's balance was impaired (at one point appellant "started to stagger and fall against the car"), and observed several "bottles" (possibly Budweiser) in the station wagon. Appellant was able to respond to the fireman's inquiries with appropriate answers and stated repeatedly that he "didn't see them" or "didn't see them turning." A paramedic also observed appellant at the scene "in the process of either sitting down or falling down in front of his vehicle." In assessing appellant for potential injuries, the paramedic smelled alcohol and asked if appellant had been drinking. Appellant replied, "Yes. I had a few. It was a while ago. I'm not drunk...." Appellant's speech was "okay" and appellant gave appropriate responses to the paramedic's questions. The paramedic further testified that while he was transporting Mary Fink, appellant, Heather Johnson and her child to the hospital, Heather Johnson stated that the station wagon was about to turn and "he turned in front of the other vehicle."

[¶ 6] Officer Christopher Schell of the Wyoming Highway Patrol arrived at the scene shortly after the collision. He observed both empty and full beer bottles in the station wagon, including some located in the front seat area. According to Officer Schell, appellant had bloodshot eyes, was unsteady on his feet, and he observed an odor of alcohol coming from appellant.

[¶ 7] Dr. Mary MacGuire, a general surgeon, encountered appellant at the emergency room. Appellant "smelled strongly of alcohol," slurred his speech, experienced difficulty focusing, and appeared to be intoxicated. Dr. MacGuire then treated Albert Fink, who arrived with "flail chest" in at least four segments (patients usually present with only one "flail segment") indicating a very severe injury to the skeleton of the chest wall and severe soft tissue injuries to the lungs and heart. Albert Fink was in irreversible shock, was bleeding into his abdomen, and had suffered severe pulmonary injuries. Dr. MacGuire performed emergency surgery to remove or repair Albert Fink's internal organs and stop his internal bleeding. Even after surgery and receiving medication, Albert Fink was unable to maintain adequate blood pressure. In the doctor's opinion, Albert Fink had suffered "unsurvivable" injuries in the collision. He died at 3:00 a.m. on April 15, 1999, about twelve hours after the collision.

[¶ 8] Mary Fink sustained a complex fracture of the "right lower leg in the region of the ankle" in the collision, in addition to a possible heart contusion. Dr. MacGuire did not observe any other "significant injuries" to Mary Fink during an initial emergency room examination. According to information provided to the Natrona County Coroner, Dr. James Thorpen, Mary Fink was under medical care at the hospital on April 14, 1999, until she was discharged "a couple of days later." She underwent surgery for "an open reduction and internal fixation" of the ankle fracture on May 6, 1999, and the surgery "appeared to go well." After complaining of extreme dizziness early the morning of May 7, 1999, Mary Fink "passed out" and died while at the hospital.

[¶ 9] At 4:10 p.m. on April 14, 1999, a paramedic obtained a blood sample from appellant at Officer Schell's request. According to the State's forensic toxicologist, a subsequent test revealed that appellant's blood alcohol concentration was .15% at the time the sample was taken (assuming appellant had not consumed alcohol since the collision, it would have been as high as .17% at the time of the collision), and the sample was also positive for the presence of cannabinoids, which impair the central nervous system in a manner similar to alcohol. Appellant's testing of the sample resulted in a .127% blood alcohol concentration; however, the State presented testimony regarding the possibility of evaporation associated with delays between testing. Appellant was ultimately charged with two counts of aggravated homi-

cide by vehicle alternatively asserting that appellant violated Wyo. Stat. Ann. § 6–2–106(b)(i) and/or (b)(ii) regarding each count.

[¶ 10] Mary Fink told Officer Schell that immediately prior to the collision, she looked down at her speedometer, took her foot off the accelerator to slow down, looked up and said "Oh, my God," and then collided with the Allen vehicle, which she did not see until the last possible second. Rick Dye, a Wyoming Highway Patrol officer since 1980, testified as an expert accident reconstructionist for the State. According to Officer Dye, the station wagon, traveling eastbound on Wyoming Boulevard, began to execute a left turn onto McKinley Street prematurely, turning into the westbound lane across a double-yellow line twenty to twenty-five feet prior to the actual intersection. The station wagon was traveling between one-half and twenty miles per hour and the Ford Tempo was traveling westbound between fifty and fifty-five miles per hour. The vehicles collided, without an evasive maneuver by the station wagon. Officer Schell observed "very short" skid marks from the Fink vehicle. Had the station wagon completed its turn, it would have entered the wrong lane of travel on McKinley Street.

[¶ 11] Based on Officer Dye's time and distance calculations regarding each vehicle's visibility and reaction time, as well as his observations of the intersection itself, appellant should have seen the Fink vehicle and appellant had an "appreciably longer" opportunity to visualize the intersection than did Mary Fink. In Officer Dye's training and experience, impaired drivers commonly have perception problems, fail to maintain their lane of travel, and execute steering maneuvers similar to that performed by appellant. Officer Schell added that in his training and experience, impaired drivers experience difficulty with distraction and their ability to react is substantially slowed. Officer Dye testified that every driver he had encountered whose blood alcohol concentration exceeded .10% was "substantially" impaired. He ultimately opined that appellant did not react to, or observe, the "imminent hazard that the Fink vehicle presented" due to intoxication.

[¶ 12] Appellant testified in his own defense. He testified that, after drinking at Frank Allen's home the previous night, finishing the last of his seven or eight beers at 1:00 a.m., he consumed three more beers between 1:35 p.m. and 2:30 p.m. on April 14, 1999, but did not otherwise consume alcohol that day.[1] According to his testimony, appellant approached the McKinley Street intersection, which was unfamiliar to him, slowed to enter the turning lane, looked to verify the street sign, was alerted by his brother's voice, and saw the Fink's vehicle "headed towards the passenger front" of appellant's vehicle at an angle. Appellant noticed the driver of the Fink vehicle looking down at the dash, then applied his brakes, causing the station wagon to pull strongly to the left without locking up the vehicle's tires. The Fink vehicle turned to the right, and the collision followed.

[¶ 13] James R. Johnson testified as an expert accident reconstructionist for appellant. Based on Mr. Johnson's calculations, including skid-to-stop distance, the road conditions, the road's physical characteristics and visibility considerations, and the deficient condition of appellant's brakes (appellant apparently purchased the station wagon days prior to the collision), appellant would not have been able to stop the station wagon prior to the McKinley Street intersection. He added that the angle of the Fink vehicle's skid marks indicated that it crossed the centerline prior to the collision, and that the condition of appellant's brakes could cause appellant's vehicle to pull to the left. The State called witnesses to refute Mr. Johnson's testimony regarding the condition of appellant's brakes and its resulting implications.

[¶ 14] On December 16, 1999, a jury entered separate "guilty" findings on each count pursuant to both statutory subsections.

---

1. An expert witness for the State testified that, assuming appellant's testimony to be true, also considering appellant's weight and his testimony regarding what he ate that day, one would expect appellant's blood alcohol concentration to be .055% at the time of the collision.

## DISCUSSION

### MOTION TO SUPPRESS

[¶ 15] Appellant first argues that the district court should have suppressed his April 14, 1999, blood sample, including the resulting blood-alcohol concentration, because Officer Schell did not comply with the implied consent statute prior to procuring the sample. According to appellant, Officer Schell was required to follow implied consent procedures because at the time the blood was drawn, appellant was "charged" with driving while under the influence, appellant was not dead, unconscious or otherwise incapable of refusal, and serious bodily injury or death had not resulted from the collision. Even if serious bodily injury had resulted, appellant asserts that Officer Schell did not comply with Wyo. Stat. Ann. § 31–6–102(d) (Lexis-Nexis 2001), and generally states that the circumstances of this case did not justify a warrantless seizure of appellant's blood pursuant to the Fourth Amendment to the United States Constitution, *Van Order v. State*, 600 P.2d 1056 (Wyo.1979), or *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973).

[¶ 16] On September 10, 1999, appellant's defense counsel filed a motion to suppress the April 14, 1999, blood sample. The district court held an evidentiary hearing[2] on the motion on November 10, 1999. At the hearing, Officer Schell, a Wyoming Highway Patrol officer for nearly four years, testified that on April 14, 1999, he responded to the scene of the collision at 2:53 p.m. Based on the evidence at the scene, it appeared to Officer Schell that appellant's station wagon was traveling eastbound on Wyoming Boulevard and began to turn left "prior to the actual intersection where you would normally turn into that lane of travel." The station wagon was turning across the westbound lane of Wyoming Boulevard and if the vehicle had completed the turn, it would have turned into the southbound lane of McKinley Street, "which is the opposite lane from which he should have ended up." At some point, the station wagon collided with the Finks' Ford

Tempo, which was traveling westbound on Wyoming Boulevard. Mary Fink was driving the Ford Tempo, and her husband, Albert Fink, was a passenger in the vehicle. It appeared that the Ford Tempo was the only vehicle to exhibit braking "behavior" immediately prior to the collision, and according to Officer Schell, there was no reason, "in terms of the vehicles' ability to see," regarding why the collision occurred. Based on Officer Schell's training and experience, intoxicated drivers commonly fail to perceive speed, distance, and other objects.

[¶ 17] Upon arriving at the scene, medical and fire personnel pointed out appellant as the driver of the station wagon. Officer Schell spoke with appellant, who indicated that he was driving the station wagon. Witnesses at the scene also informed Officer Schell that they saw an individual matching appellant's description run from the driver's side of the station wagon to the Ford Tempo, and that appellant stated, "I'm sorry; I'm sorry; I did not see them." Heather Johnson, a passenger in the station wagon, stated appellant was driving the vehicle, that it had been traveling eastbound, and that it had drifted across the centerline numerous times prior to the collision. Medical personnel who interacted with appellant at the scene stated that appellant was "definitely intoxicated." Officer Schell observed a "strong odor of alcohol" coming from appellant and observed alcohol containers in the station wagon.

[¶ 18] At the hospital, Officer Schell believed Mr. Fink's medical condition to be "[c]ritical, very serious" and Mr. Fink was "obviously seriously injured." A nurse informed him that Mr. Fink was "serious" ("she couldn't give ... much more"), but Officer Schell did not know that Mr. Fink's death was imminent. Mrs. Fink apparently suffered a broken ankle and a "possible bruised heart...." Officer Schell again contacted appellant at the hospital and noticed an "odor of alcohol I had noticed earlier when I initially contacted him on the scene." Officer Schell informed appellant that "due to the serious bodily injury, we [are] going to

---

**2.** We reiterate some factual information to analyze this issue in the context of the testimony received at the evidentiary hearing.

need to draw a blood sample...." Appellant replied, "[f]ine. I haven't had anything to drink." Officer Schell stated that he did not advise appellant in accordance with the implied consent statutes "[b]ecause of the serious bodily injury at the time," but informed appellant prior to obtaining the blood sample that appellant was "going to be charged with DUI...." At Officer Schell's direction, a paramedic drew the blood sample. Officer Schell testified that appellant was not under arrest at that time and had not yet been issued a citation. Officer Schell later issued appellant a citation (the record does not indicate the cited offense), but did not place appellant in custody. Appellant was scheduled to be released from the hospital.

[¶ 19] Relying primarily on *Van Order*, 600 P.2d 1056, the district court denied appellant's motion, finding that the factual circumstances gave "rise to the vehicular homicide charges or the potential for those charges," that "serious, if not critical" injuries were involved, that Officer Schell had probable cause to draw appellant's blood based on the evidence he had obtained to that point, and had the blood not been drawn, it would have been "lost forever...."

 [¶ 20] We review a district court's denial of a motion to suppress for an abuse of discretion. *Madrid v. State*, 910 P.2d 1340, 1344 (Wyo.1996).

> "Findings on factual issues made by the district court considering a motion to suppress are not disturbed on appeal unless they are clearly erroneous. *Hyde v. State*, 769 P.2d 376, 378 (Wyo.1989); *Roose v. State*, 759 P.2d 478, 487 (Wyo.1988). * * * Since the district court conducts the hearing on the motion to suppress and has the opportunity to: assess the credibility of the witnesses; the weight given the evidence; and make the necessary inferences, deductions and conclusions, evidence is viewed in the light most favorable to the district court's determination. *United States v. Werking*, 915 F.2d 1404, 1406 (10th Cir.1990)."

*Madrid*, 910 P.2d at 1344 (*quoting Wilson v. State*, 874 P.2d 215, 218 (Wyo.1994)). Appellant does not advance an independent state constitutional analysis on this issue.

 [¶ 21] Wyo. Stat. Ann. § 31–6–102 provides, in pertinent part:

(a) If arrested for an offense as defined by W.S. 31–5–233:

(i) Any person who drives or is in actual physical control of a motor vehicle upon a public street or highway in this state is deemed to have given consent, subject to the provisions of this act, to a chemical test or tests of his blood, breath or urine for the purpose of determining the alcohol concentration or controlled substance content of his blood. The test or tests shall be:

(A) Incidental to a lawful arrest;

(B) Given as promptly as possible after the arrest;

(C) Administered at the direction of a peace officer who has probable cause to believe the person was driving or in actual physical control of a motor vehicle upon a public street or highway in this state in violation of W.S. 31–5–233(b) or any other law prohibiting driving under the influence as defined by W.S. 31–5–233(a)(v). The peace officer who requires a test pursuant to this section may direct that the test shall be of blood, breath or urine. However, if the officer directs that the test be of the person's blood or urine, the person may choose whether the test shall be of blood or urine. The person has this option unless the peace officer has probable cause to believe there is impairment by a controlled substance which is not subject to testing by a blood or breath test in which case a urine test may be required.

(ii) For tests required under this act, the arrested person shall be advised that:

(A) His failure to submit to all required chemical tests requested by the peace officer shall result in the suspension of his Wyoming driver's license or his privilege to operate a motor vehicle for a period of six (6) months for a first offense or eighteen (18) months for a second or subsequent offense as provided by W.S. 31–6–107;

(B) If a test is taken and the results indicate the person is under the influence of alcohol or a controlled substance, he may be subject to criminal penalties and his Wyoming driver's license or his privilege to operate a motor vehicle shall be suspended for ninety (90) days; .

(C) After submitting to all required chemical tests requested by the peace officer at a place and in a manner prescribed by and at the expense of the agency employing the peace officer, the arrested person may go to the nearest hospital or clinic and secure any additional tests at his own expense;

(D) If he refuses to take all required tests, he shall not be eligible for limited driving privileges.

* * *

(c) Any person dead, unconscious or otherwise in a condition rendering him incapable of refusal to submit to the tests is deemed to have given his consent provided by subsection (a) of this section and the tests may be administered subject to the provisions of this act.

(d) If a person under arrest refuses upon the request of a peace officer to submit to a chemical test designated by the agency employing the peace officer as provided in subsection (a) of this section, none shall be given except in cases where serious bodily injury or death has resulted. The peace officer shall submit his signed statement to the department. The statement submitted by the officer shall contain:

(i) His probable cause to believe the arrested person was driving or in actual physical control of a motor vehicle:

(A) On a public street or highway in this state;

(B) In violation of W.S. 31–5–233(b) or any other law prohibiting driving under the influence as defined by W.S. 31–5–233(a)(v); and

(ii) That the person refused to submit to a test upon the request of the peace officer.

[¶ 22] The implied consent statute details the exclusive procedures to be followed where an individual is arrested and the officer has probable cause to suspect driving while under the influence, but the statute is exclusive "only insofar as that offense [is] concerned." *Van Order*, 600 P.2d at 1058 (*citing State v. Chastain*, 594 P.2d 458, 461 (Wyo.1979), *overruled on other grounds by Olson v. State*, 698 P.2d 107 (Wyo.1985)). In *Chastain*, 594 P.2d at 461, 463, this Court upheld the exclusion of a blood sample from Chastain's "trial for DWUI" where (1) the State conceded that the defendant "was *not* under arrest and, therefore, the blood-alcohol test would not be admissible for that reason alone;" (2) the officer did not "come close" to fulfilling the implied consent statute's requirements prior to obtaining the blood sample; and (3) the blood sample was obtained "solely in the context of DWUI" and "no other charges were contemplated against the defendant (e.g., no mention of careless driving, no facts to support a greater charge than DWUI, such as vehicular homicide)." (Emphasis in original.) In *Van Order*, this Court upheld the admissibility of a blood sample in Van Order's "trial for negligent homicide," for if " 'the factual situation gave rise to a charge of vehicular homicide *or the potential* for such a charge, [the implied consent] statute would have no applicability. A blood test may be taken incident to an arrest for such a crime and may be admissible without regard to the Implied Consent Law.' ". *Van Order*, 600 P.2d at 1058 (*quoting Chastain*, 594 P.2d at 461 n. 4) (emphasis in original).

[¶ 23] The implied consent statute does not apply to the circumstances of appellant's case because when appellant's blood was drawn, the facts "gave rise" to charges, or the potential for charges, other than those defined by Wyo. Stat. Ann. § 31–5–233 (LexisNexis 2001). The evidence Officer Schell obtained regarding appellant's driving prior to the collision, the manner in which the collision occurred, the extent of the Finks' injuries, and the evidence associated with appellant's intoxication certainly implicated an aggravated assault and battery[3] charge

---

3. Wyo. Stat. Ann. § 6–2–502(a) (LexisNexis 2001) provides that a person is guilty of aggra-

vated assault and battery if he:

and, considering the extent of Mr. Fink's injuries, the potential for an aggravated vehicular homicide charge. *See Nowack v. State*, 774 P.2d 561, 563–66 (Wyo.1989) and *Van Order*, 600 P.2d at 1058–59.

[¶ 24] Accordingly, we conclude that the blood test was admissible in appellant's trial for aggravated vehicular homicide. It is not necessarily "important that we decide whether or not [a] defendant was arrested in a formal sense" to evaluate its admissibility in this context because a warrantless body search may be conducted even " 'in spite of the fact that the person searched is not formally under arrest' " when (1) sufficient probable cause exists to support a formal arrest; (2) the character of the search is highly unintrusive; and (3) the evidence sought will be forever lost absent the search. *Van Order*, 600 P.2d at 1058–59 (*citing Cupp*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 and *quoting State v. Oevering*, 268 N.W.2d 68, 73 (Minn.1978)).

[¶ 25] Aside from briefly describing the *Cupp* decision and merely stating that the circumstances of appellant's case do not meet these criteria, appellant does not otherwise present cogent argument or cite to pertinent authority on the decision's application to this case. Nevertheless, the referenced facts established sufficient probable cause for a formal arrest (i.e., aggravated assault and battery). Further, "[b]lood testing is of a routine and unobtrusive character" and appellant does not argue that the procedures used to procure the blood sample were unreasonable or improper. *Van Order*, 600 P.2d at 1059.[4] Finally, the evidence of appellant's blood alcohol concentration would have been "forever lost" absent the search, as the "presence of alcohol in the blood is evanescent and disappears readily with the passage of time." *Buckles v. State*, 830 P.2d 702, 710 (Wyo.1992); *Van Order*, 600 P.2d at 1059. We remain mindful that these standards must be stringently enforced to avoid serious Fourth Amendment abuses in the form of warrantless pre-arrest investigatory searches. *Van Order*, 600 P.2d at 1059.

**FAILURE TO APPOINT SUBSTITUTE COUNSEL**

[¶ 26] Appellant asserts that the district court's failure to appoint him substitute counsel violated his rights under the Sixth Amendment to the United States Constitution. Appellant contends that he demonstrated "good cause" justifying the appointment of new counsel at various stages of the proceedings in that his defense counsel was inexperienced, there was a lack of communication between appellant and counsel, counsel failed adequately to examine witnesses at trial, and the district court made "no inquiry whatsoever" into appellant's "specific concerns" prior to trial.

[¶ 27] We review the refusal to appoint substitute counsel for an abuse of discretion:

"While a trial court has the power in its discretion to appoint substitute counsel, its refusal to do so is not error unless an abuse of discretion is shown. A factual showing of good cause for the appointment of substitute counsel is essential to the demonstration of an abuse of discretion, and good cause is to be found in incompetence, commitment to a position or an interest which would conflict with the furnishing of an effective defense to the accused, or other good reason to conclude that appointed counsel is unable to furnish effective assistance."

*Bell v. State*, 994 P.2d 947, 951 (Wyo.2000) (*quoting Irvin v. State*, 584 P.2d 1068, 1071 (Wyo.1978)). The Sixth Amendment does not guarantee a meaningful relationship with

---

(i) Causes serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

(ii) Attempts to cause, or intentionally or knowingly causes bodily injury to another with a deadly weapon;

(iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another; or

(iv) Intentionally, knowingly or recklessly causes bodily injury to a woman whom he knows is pregnant.

4. We have "extended" that principle in finding that collecting DNA samples from blood, saliva, or hair, through routine, unobtrusive procedures "is minimally intrusive." *Doles v. State*, 994 P.2d 315, 319 (Wyo.1999).

appointed counsel; the purpose of providing assistance of counsel is to ensure that criminal defendants receive a fair trial. *Bell,* 994 P.2d at 951. A defendant has no right to the appointed counsel of his choice nor to counsel who would blindly follow his instructions. *Vargas v. State,* 963 P.2d 984, 990 (Wyo. 1998). In evaluating Sixth Amendment claims, " 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.' " *Bell,* 994 P.2d at 951–52 (*quoting Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). A court's own evaluation of counsel and the effect of any substitution upon the scheduled proceedings are proper considerations in addition to the reasons given for a defendant's dissatisfaction. *State v. Stenson,* 132 Wash.2d 668, 940 P.2d 1239, 1272 (1997), *cert. denied,* 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998).

[¶ 28] Appellant filed a motion on June 22, 1999, to dismiss his attorney and have a new attorney appointed to represent him. In the motion, appellant alleged that his appointed counsel stated he "really isn't [too] familiar with this type of case," which undermined appellant's "faith and belief . . . in his attorney's ability to research, build and present a proper and well planned defense."

[¶ 29] Appellant was arraigned on June 29, 1999. Contrary to appellant's argument, the district court did address this particular motion prior to trial. At the arraignment, the district court asked if appellant would like to be heard on the motion, to which appellant replied that he would. In addition to the allegations contained in the motion, appellant claimed that his appointed counsel stated that appellant was "going to the penitentiary," and when appellant asked questions pertaining to the case, counsel replied that he "doesn't know. He's never done this before." Appellant argued that *Hughes v. State* "from 1968" supported his contention that he had the right to an attorney "experienced in my situation." [5] The district court noted that appellant's counsel possessed

> some considerable experience with cases before this Court and some cases I might even say would be on charges more com-

plex and more difficult from a defense standpoint than vehicular homicide.

> There have been very few vehicular homicide cases before this Court. And so to try to even go out and find attorneys that have actually defended or gone to trial on that charge would almost be an impossibility.

The district court denied appellant's motion, noting that appellant was free to "hire and retain counsel he may feel best meets his needs in connection with this case."

█ [¶ 30] Assuming the truth of these allegations, appellant did not demonstrate good cause to justify the appointment of substitute counsel. First, appellant had no right to the appointed attorney of his choice or desired experience, and the district court noted its assessment of counsel's experience in defending cases before it. Second, an attorney has a duty to give the accused an " 'honest appraisal of his case.' " *McKee v. Harris,* 649 F.2d 927, 932 (2nd Cir.1981), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982) (*quoting Brown v. United States,* 264 F.2d 363, 369 (D.C.Cir.), *cert. denied,* 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1959)). That "a criminal defendant views this sort of frank advice as prejudgment of guilt does not thereby convert good representation into good cause." *McKee,* 649 F.2d at 932. Third, a general loss of confidence or trust alone is insufficient to warrant substituting new counsel. *Stenson,* 940 P.2d at 1272.

[¶ 31] Appellant filed another motion dated August 16, 1999, expressing a desire to explain his "considerable concern regarding the total lack of communication and personal conflict between defendant and appointed counsel which has undermined the faith and belief by defendant in his attorney's desire and ability to research, build and present a proper and well planned defense." He requested that new counsel be appointed to represent him. An identical motion dated October 11, 1999, was filed on November 15, 1999. It does not appear that the district court acted expressly on either motion or conducted a formal inquiry into these partic-

---

5. We were unable to locate this particular case based on the information provided.

ular contentions. The State does not cite to any such inquiry in the record.

[¶ 32] A district court has a duty to make some formal inquiry into, or engage the defendant in a colloquy regarding, the defendant's reasons for dissatisfaction with his appointed counsel when substitution of counsel is requested. *United States v. Anderson*, 189 F.3d 1201, 1210 (10th Cir.1999) (*quoting Johnson v. Gibson*, 169 F.3d 1239, 1254 (10th Cir.), *cert. denied*, 528 U.S. 972, 120 S.Ct. 415, 145 L.Ed.2d 324 (1999)); *United States v. Graham*, 91 F.3d 213, 221 (D.C.Cir.1996), *cert. denied*, 519 U.S. 1136, 117 S.Ct. 1003, 136 L.Ed.2d 882 (1997). Such an inquiry not only helps the defendant (especially when the request is pro se) "adequately to express the reason for his dissatisfaction with counsel, thereby promoting confidence in the integrity of the process and in the jury's verdict," but also "creates an opportunity for the court to ease the defendant's concern if it is ill-founded...." *Graham*, 91 F.3d at 221. However, even if appellant demonstrates that the district court did not properly address his motions to substitute counsel, he must demonstrate that the error was prejudicial to his case (i.e., that he was not afforded effective representation as guaranteed by the Sixth Amendment). *Graham*, 91 F.3d at 221. This Court having found that appellant's defense counsel was not ineffective, appellant has not met his burden on this issue.

[¶ 33] Lastly, the following occurred in the jury's presence after Tina Evans testified the first day of trial:

[APPELLANT]: Excuse me, Your Honor. Before we continue, may I make a brief statement?

THE COURT: I don't think you should. Have you conferred with [defense counsel]?

\* \* \*

[DEFENSE COUNSEL]: This is new to me.

[PROSECUTOR]: Your Honor, this is probably something that shouldn't be before the jury.

[APPELLANT]: I just want to make a statement for the record, Your Honor. I don't believe that I'm getting adequate assistance of counsel. [Defense counsel] is refusing to bring forth discrepancies and statements made seven months ago and statements made—

THE COURT: Let's do it this way, sir. We're going to go ahead with the evidence. I note throughout the trial you have been conferring with [defense counsel]. And I would urge you to continue to do so.

At the conclusion of the witnesses here today—I'm not going to delay this trial right now. I'll give you a chance to be heard on the record. Okay?

[APPELLANT]: Thank you, Your Honor.

Later that day, the district court allowed appellant to be heard outside the jury's presence. Appellant was primarily concerned that his defense counsel did not inquire as to why unspecified prior written witness statements (presumably referring to Linda Evans and/or Tina Evans) were "drastically different" than the witnesses' testimony and reiterated his general belief that he was not "adequately represented...." Appellant stated that he

put in five separate motions for alternate assistance of counsel. And I've been denied. I've got two motions that I wasn't even heard on. So it's not like this is something that just came up while I'm sitting here in today's proceedings. This is something that has been a question in my mind since day one. I honestly don't believe I'm adequately represented on this.

The district court observed that

[o]ne of the things I note in trial proceedings, especially, is there are rules of evidence that govern what you can ask. And so very often lay people will have ideas about things they think should be asked or inquired about, but they might not come within the rules of evidence.

And until you have gone through not just law school but also the experience of having been in court a lot, it's hard to understand how those rules work. Also, I know there's a lot to trial tactics. And [defense counsel] has appeared in several jury trials before this Court. And very

often you do not want to ask certain types of questions because they can backfire on you or not be the questions that will fit with your theory of the case. So I make those observations to you.

In the course of this trial, I've observed [defense counsel's] questioning, his voir dire, his objecting. And it seems to me he has been diligently representing you....

\* \* \*

... I've already noted ... that throughout this case and its proceedings, I have not seen anything that would constitute inadequate representation of the defendant in this case.

We've gone through motion proceedings; we've gone through pretrial matters; we've gone through trial proceedings here today. And I don't see anything that would constitute inadequate representation.

\* \* \*

... I don't know what the defendant would want me to do after the trial has begun here. I don't think there's any actions the Court can take, especially absent some type of showing of inability to communicate with counsel, mistakes being made, that would drastically affect the defense's right in this case.

The district court encouraged defense counsel to continue communicating with appellant about the anticipated witnesses and appellant's desired areas of inquiry.

■■ [¶ 34] Considering the stage in the proceedings, the district court's assessment of appellant's defense counsel, and that counsel appeared to have conferred with appellant to this point during the trial, appellant did not demonstrate good cause to justify the appointment of substitute counsel. Defense counsel did cross-examine Tina Evans regarding why she did not include information that she testified to in a prior written state-

6. Appellant refers to the hearing on his suppression motion for additional support. At the hearing, appellant requested that a particular legal argument be made on his behalf. After conferring with appellant, defense counsel placed appellant's argument on the record and attributed it to him. Later in the hearing, the district court allowed appellant to verbally supplement his

ment, and we note that whether and how to conduct cross-examination generally is a strategic and tactical decision to be made by counsel after consultation with the client, where feasible and appropriate. *Grainey v. State*, 997 P.2d 1035, 1040–41 (Wyo.2000) (*quoting* ABA Standards for Criminal Justice, *Prosecution Function and Defense Function* (3rd ed. 1993)).[6]

## INEFFECTIVE ASSISTANCE OF COUNSEL

■■ [¶ 35] Appellant alleges that his defense counsel was deficient in several respects which denied him effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and Wyo. Const. art. 1, § 10. Our standard for reviewing such claims is as follows:

"When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Herdt v. State*, 891 P.2d 793, 796 (Wyo.1995); *Starr v. State*, 888 P.2d 1262, 1266–67 (Wyo. 1995); *Arner v. State*, 872 P.2d 100, 104 (Wyo.1994); *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986). The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Herdt*, at 796; *Starr*, at 1266; *Arner*, at 104; *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

Under the two-prong standard articulated in *Strickland* and *Frias*, an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Starr*, at 1266; *King v. State*, 810 P.2d 119, 125 (Wyo.1991)

counsel's legal argument in support of the suppression motion and reiterated its decision on the issue considering the additional argument. These circumstances do not necessarily implicate a request for substitute counsel, but do evidence the district court's approach in allowing appellant to be heard upon request.

(Cardine, J., dissenting); *Campbell v. State*, 728 P.2d 628, 629 (Wyo.1986); *Frias*, 722 P.2d at 145. In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to 'render such assistance as would have been offered by a reasonably competent attorney' and that 'counsel's deficiency prejudiced the defense of [the] case.' *Lower v. State*, 786 P.2d 346, 349 (Wyo.1990). 'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064."

*Chapman v. State*, 2001 WY 25, ¶ 6, 18 P.3d 1164, 1168–69 (Wyo.2001) (*quoting Grainey*, 997 P.2d at 1038–39).

"We examine the conduct of defense counsel in light of all the circumstances in determining whether the identified acts or omissions fall outside the ambit of professionally competent assistance, bearing in mind the function of counsel is to make the adversarial testing process work in every case. We do not evaluate the efforts of counsel from a perspective of hindsight but, rather, we endeavor to reconstruct the circumstances surrounding counsel's challenged conduct and evaluate the professional efforts from the perspective of counsel at the time."

*Bloomquist v. State*, 914 P.2d 812, 820 (Wyo. 1996) (*quoting Dickeson v. State*, 843 P.2d 606, 609 (Wyo.1992)). In evaluating the prejudice component, the test is whether there is a reasonable probability that counsel's errors affected the outcome of the trial, primarily concerning whether the result was unreliable or the proceeding fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. However, an "analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."

*Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), *cert. denied*, 525 U.S. 846, 119 S.Ct. 115, 142 L.Ed.2d 92 (1998); *Newsted v. Gibson*, 158 F.3d 1085, 1092 (10th Cir.1998), *cert. denied*, 526 U.S. 1093, 119 S.Ct. 1509, 143 L.Ed.2d 661 (1999).

[¶ 36] The burden of proving that counsel was ineffective rests on the appellant. *Sorensen v. State*, 6 P.3d 657, 660 (Wyo.2000), *cert. denied*, 531 U.S. 1093, 121 S.Ct. 818, 148 L.Ed.2d 702 (2001). A failure to "make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700, 104 S.Ct. 2052. Indeed, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697, 104 S.Ct. 2052.

### A. Discovery of Medical Records

[¶ 37] Appellant contends that his defense counsel was ineffective because, despite recognizing the importance of Mary Fink's medical records in determining "the actual cause of her death," counsel did not subpoena the records after the district court denied a motion to compel their production because the records were not within the prosecution's "possession, custody, or control." According to appellant, there "can be no tactical reason for such an action (or inaction)" and in light of "what little was known about Mrs. Fink's condition," the records "could" have provided "the additional evidence Appellant needed." The State merely argues, without citation to pertinent authority, that the record does not indicate that these medical records "were helpful" to appellant's case.

[¶ 38] Appellant is quite unspecific as to the nature and extent of the medical records his defense counsel purportedly failed to subpoena. Our review of the record indicates that on September 10, 1999, appellant's defense counsel filed a demand for discovery requesting that the prosecution provide Mary Fink's "medical records, including records of any prescribed medications." Defense counsel elaborated at a subsequent hearing that

hospital and/or doctor's records prior to, and immediately after, the collision with appellant might indicate whether Mary Fink had pre-existing conditions or was taking medication (coagulants/anticoagulants) that "would have made this type of incident more likely in her than in anybody else."

[¶ 39] It is appellant's burden to establish the requisite prejudice. Appellant does not articulate precisely how his defense counsel's failure to formally subpoena medical records significantly prejudiced his defense nor does appellant cite to pertinent authority in advancing this argument. We recognize that it "is neither possible nor appropriate to establish a rigid formula or a single, absolute criterion to measure whether this burden has been met." *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1015 (7th Cir. 1987), *cert. denied*, 498 U.S. 842, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990). Yet, appellant cannot expect to satisfy his burden absent *some* showing or allegation as to how the absence of this information rendered the jury's verdict fundamentally unfair or unreliable. *See generally Marberry v. State*, 686 S.W.2d 31, 32 (Mo.App.1984) (*quoting Rice v. State*, 585 S.W.2d 488 (Mo.1979)).

[¶ 40] Considering the purpose for which defense counsel sought the medical records, and in response to appellant's characterization that "little was known about Mrs. Fink's condition," the record does indicate that appellant's defense counsel possessed Mary Fink's autopsy report, which was introduced as an exhibit during the cross-examination of the county coroner, Dr. Thorpen. The substance of Dr. Thorpen's testimony will be set forth in detail later in this opinion. Dr. Thorpen relied on the autopsy report in establishing Mary Fink's cause of death, and appellant's defense counsel utilized the report extensively to cross-examine Dr. Thorpen, particularly regarding Mary Fink's pre-existing risk factors for developing blood clots and their impact on whether appellant caused her death. On cross-examination, Dr. Thorpen did acknowledge several "possibilities" consistent with the defense's approach to the causation issue, although in Dr. Thorpen's opinion, these possibilities were speculative and the ankle fracture merely enhanced the pre-existing risk factors.[7] Appellant has not demonstrated that his right "to require the prosecution's case to survive the crucible of meaningful adversarial testing" was impinged. *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

**B. The Finks' Failure to Wear Lap Belt Restraints**

■■■ [¶ 41] Officer Schell testified on cross-examination that the Finks had "their shoulder belts on and no lap belt restraints." The Finks' vehicle was apparently equipped with shoulder belts that "move as you open and close the door." Appellant contends that his defense counsel was ineffective because he did not "grasp the significance" of the Finks' failure to wear lap belt restraints as to whether appellant's conduct proximately caused the Finks' deaths, the failure to wear proper restraints having constituted an "intervening" cause. According to appellant, defense counsel therefore improperly conceded in opening statement that the "accident caused Mr. Fink's death," and did not sufficiently emphasize the lap belt restraint issue in opening statement, closing argument, or questioning the witnesses. The State merely argues, without citation to pertinent authority, that "there is nothing in the record that indicates the injuries would have been less severe had the seatbelts been used differently." Of course, this failure to develop the evidence, in part, provides the basis for appellant's ineffective assistance of counsel argument.

■■■ [¶ 42] The state must prove that a defendant's wrongful conduct (recklessness or driving while under the influence, depending upon which statutory subsection is used to charge the defendant) proximately caused the victims' deaths. To be the "proximate cause," the accident or injury must be

---

7. No expert witness testified on this issue during appellant's case in chief; however, in order to assert that trial counsel was therefore ineffective, one must demonstrate that an expert witness was available to testify consistently with the defense's theory and that such testimony was necessary. *Bloomquist,* 914 P.2d at 820.

the natural and probable consequence of the defendant's wrongful conduct; a "substantial factor" in bringing about the injuries or death. *Bloomquist*, 914 P.2d at 820 (*quoting Glazier v. State*, 843 P.2d 1200, 1204 (Wyo. 1992) and *McClellan v. Tottenhoff*, 666 P.2d 408, 414 (Wyo.1983)). The contributory negligence of a victim is not a defense in a criminal prosecution, but a victim's actions may be considered whenever those actions have a bearing upon the defendant's alleged wrongful conduct [8] or in determining whether the defendant's wrongful conduct was the proximate cause of a victim's death. *Candelaria v. State*, 895 P.2d 434, 438 (Wyo.1995); *Buckles*, 830 P.2d at 707–08.

"A defendant is usually relieved of liability by an unforeseeable intervening cause. However, an intervening cause does not relieve an earlier actor of liability if it was reasonably foreseeable. The causal connection is not broken where the original wrongdoer could reasonably have foreseen that injury to another would be a probable consequence of his [wrongful conduct]."

*Glazier*, 843 P.2d at 1205 (*quoting McClellan*, 666 P.2d at 414); *Bloomquist*, 914 P.2d at 820–21.

[¶ 43] In the context of this criminal aggravated vehicular homicide case involving evidence of appellant's intoxication, we find the following reasoning persuasive:

One who drinks and drives should reasonably foresee that some among the potential victims of drunken driving will not wear seat belts and that such victims, among others, might be seriously injured in an alcohol-induced collision.

*State v. Freeland*, 176 Ariz. 544, 863 P.2d 263, 267 (1993). For this reason, a victim's failure to wear a seat belt does not supersede a criminal defendant's causal responsibility.[9] Other jurisdictions have similarly found that a victim's failure to wear a seat belt is not sufficient to supersede a criminal defendant's conduct in causing the victim's injuries or death. *See generally Panther v. State*, 780 P.2d 386, 394–95 (Alaska App.1989); *State v. Stewart*, 60 Conn.App. 301, 759 A.2d 142, 147–49, *cert. granted on other grounds*, 255 Conn. 913, 763 A.2d 1039 (2000), *cert. denied*, 258 Conn. 909, 782 A.2d 1250 (2001); *State v. Hubka*, 480 N.W.2d 867, 870–71 (Iowa 1992); *State v. Myers*, 88 N.M. 16, 536 P.2d 280, 286 (1975); *State v. Dodge*, 152 Vt. 503, 567 A.2d 1143, 1144 (1989); *State v. Nester*, 175 W.Va. 539, 336 S.E.2d 187, 189 (1985); and *State v. Turk*, 154 Wis.2d 294, 453 N.W.2d 163, 164–65 (1990). To the extent a contrary inference might arise from our decision in *Candelaria*, 895 P.2d 434,[10] it is overruled.

[¶ 44] Accordingly, appellant's counsel was not ineffective in this respect.

### C. Failure to Question Linda Evans Regarding Her Prior Written Statement

[¶ 45] Appellant contends that his defense counsel was ineffective in not cross-examining witness Linda Evans regarding her prior written statement. In particular, appellant claims that Linda Evans testified at trial to her observations of appellant at the scene of the collision (that appellant appeared to be intoxicated, that she smelled alcohol on appellant's breath, and that appellant's eyes were bloodshot), but allegedly did not include this information in a prior written statement. Appellant argues only that "no sound trial strategy" could support defense

---

8. Appellant does not argue that the Finks' failure to wear lap belt restraints had a bearing on his wrongful conduct.

9. It is conceivable that in certain circumstances, wearing a seat belt "might contribute to the death of a victim, but it hardly could be claimed that this circumstance would absolve the defendant [by] constituting an intervening cause." *State v. Dodge*, 152 Vt. 503, 567 A.2d 1143, 1144 (1989).

10. The appellant in *Candelaria*, 895 P.2d at 437, had proposed a jury instruction to define the term "intervening cause," which the district court rejected. Candelaria argued that the jury should have been instructed that the "victims' negligence in failing to wear seat belts could be used as an intervening cause." *Id.* at 438. This Court disagreed, finding that the proposed instruction was unnecessary in light of the instruction given that the jury could consider the victims' actions in determining whether Candelaria's wrongful act was the proximate cause of the victims' deaths. *Id.* The foreseeability issue was not expressly addressed in our holding in *Candelaria*.

counsel's failure to cross-examine Linda Evans and expose this "inconsistency."

[¶ 46] Linda Evans' omission of such information from her written statement does not necessarily render her later testimony "inconsistent," but might have been utilized in impeaching her recollection or for other impeachment purposes. Appellant presents no cogent argument or pertinent authority as to how this perceived deficiency prejudiced him, and appellant has therefore failed to meet his burden on the issue.[11]

### D. Failure to Request a Mistrial or Move to Withdraw Following Appellant's Comment in the Jury's Presence

[¶ 47] Appellant asserts that his defense counsel was ineffective by not taking "curative action," such as moving for a mistrial or to withdraw from the case, after appellant commented about his defense counsel's representation in the jury's presence. According to appellant, the jury "could only be distracted from the evidence" based on appellant's remarks, which remarks "may" have left an impression that appellant's defense counsel was ineffective and lessened defense counsel's impact thereafter. Further, a motion to withdraw would have "been of some benefit" to appellant because the "trial court could reasonably have granted that motion in these circumstances. . . ."

[¶ 48] We reiterate appellant's comments in the jury's presence following Tina Evans' testimony:

[APPELLANT]: Excuse me, Your Honor. Before we continue, may I make a brief statement?

THE COURT: I don't think you should. Have you conferred with [defense counsel]?

* * *

[DEFENSE COUNSEL]: This is new to me.

[PROSECUTOR]: Your Honor, this is probably something that shouldn't be before the jury.

[APPELLANT]: I just want to make a statement for the record, Your Honor. I don't believe that I'm getting adequate assistance of counsel. [Defense counsel] is refusing to bring forth discrepancies and statements made seven months ago and statements made—

THE COURT: Let's do it this way, sir. We're going to go ahead with the evidence. I note throughout the trial you have been conferring with [defense counsel]. And I would urge you to continue to do so.

At the conclusion of the witnesses here today—I'm not going to delay this trial right now. I'll give you a chance to be heard on the record. Okay?

[APPELLANT]: Thank you, Your Honor.

The district court later allowed appellant to be heard outside the jury's presence, which we previously set forth in detail.

[¶ 49] Appellant has not established how his comments actually (as opposed to hypothetically) prejudiced him to a degree that necessitated a mistrial or how the failure to make such a motion ultimately prejudiced his defense. Before making a motion, counsel must be aware of some basis in law or fact from which relief can be granted. *Bloomquist*, 914 P.2d at 821. Prejudice cannot result from counsel's failure to make such a motion when that relief is not available. *Id.* Appellant has not cited to anything in the record that suggests the jury was distracted from the evidence or that defense counsel's effectiveness was in any way diminished following the remarks. Absent sufficient actual prejudice to appellant, there was no basis in fact to support granting a mistrial. *Ryan v. State*, 988 P.2d 46, 62 (Wyo.1999).

[¶ 50] It is clear from what transpired when appellant later elaborated on his concerns to the district court that appellant essentially placed the issue of defense counsel's continued representation before the district court. In light of that discussion, the district court's ruling on the issue, and our finding that appellant did not thereby demonstrate

---

11. Appellant's defense counsel did cross-examine Tina Evans regarding why she did not include similar information or observations in her own prior written statement, to which Tina Evans simply replied, "I probably didn't write it down. I guess I should have. . . ."

good cause to justify substituting counsel, a formal motion to withdraw would have been superfluous.

### E. Failure to Request Homicide by Vehicle Jury Instruction

■ [¶ 51] Appellant argues that his defense counsel was ineffective for not requesting a jury instruction on the elements of homicide by vehicle pursuant to Wyo. Stat. Ann. § 6–2–106(a). According to appellant, homicide by vehicle is a lesser-included offense of aggravated homicide by vehicle, the evidence supported giving such an instruction, and the instruction would not have been contrary to the defense's theory of the case. In support of their respective arguments, appellant cites to *Bloomquist*, 914 P.2d 812, and the State cites to *Balsley v. State*, 668 P.2d 1324 (Wyo.1983). Neither party thoroughly analyzes the application of these cases to the elements of the putative lesser/greater offenses.

[¶ 52] Wyo. Stat. Ann. § 6–2–106 provides, in pertinent part:

(a) Except as provided in subsection (b) of this section, a person is guilty of homicide by vehicle and shall be fined not more than two thousand dollars ($2,000.00) or imprisoned in the county jail for not more than one (1) year, or both, if he operates or drives a vehicle in a criminally negligent manner, and his conduct is the proximate cause of the death of another person. Evidence of a violation of any state law or ordinance applying to the operation or use of a vehicle or to the regulation of traffic, except for evidence of a violation of W.S. 10–6–103, 31–5–233 and 41–13–206, is admissible in any prosecution under this section.

(b) A person is guilty of aggravated homicide by vehicle and shall be punished by imprisonment in the penitentiary for not more than twenty (20) years, if:

(i) While operating or driving a vehicle in violation of W.S. 10–6–103, 31–5–233 or 41–13–206, he causes the death of another person and the violation is the proximate cause of the death; or

(ii) He operates or drives a vehicle in a reckless manner, and his conduct is the proximate cause of the death of another person.

Wyo. Stat. Ann. § 6–1–104(a)(iii) (Michie 1997) defines "criminal negligence" as when a person,

through a gross deviation from the standard of care that a reasonable person would exercise ... fails to perceive a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation[.]

"Recklessly" is defined by Wyo. Stat. Ann. 6–1–104(a)(ix) as when a person

consciously disregards a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]

[¶ 53] We evaluate appellant's entitlement to such an instruction in the following context:

With specific regard for lesser-included offense instructions, we recently held that a trial court must first determine if all the elements of the lesser offense are included within the greater. If that is the case and there is some evidence that would rationally permit the jury to find the accused guilty of the lesser and not the greater offense, the instruction should be given. *Sanders v. State*, 7 P.3d 891, 894 (Wyo. 2000).... The test is more fully expressed in this five-step analytic process: (1) a proper request for the instruction is made; (2) the elements of the lesser-included offense are identical to part of the elements of the greater offense; (3) there is some evidence that would justify conviction of the lesser-included offense; (4) the proof on the element or elements differentiating the two crimes is sufficiently in dispute that the jury may consistently find the defendant innocent of the greater and

guilty of the lesser-included offense; and (5) mutuality exists such that the lesser-included charge can be demanded by either the prosecution or the defense. When all five parts of this test are met, and the lesser-included offense instruction is not given, the trial court commits reversible error. *Eatherton v. State*, 761 P.2d 91, 94–95 (Wyo.1988). *Mueller v. State*, 2001 WY .134, ¶ 9, 36 P.3d 1151, 1155–56 (Wyo.2001). Obviously, counsel's failure to request the instruction is the basis for appellant's ineffective assistance of counsel argument.

[¶ 54] We turn, then, to the test's second prong. While Wyo. Stat. Ann. § 6–2–106(a) (criminally negligent vehicular homicide) might arguably be a lesser-included offense to Wyo. Stat. Ann. § 6–2–106(b)(ii) (reckless aggravated vehicular homicide),[12] the elements of Wyo. Stat. Ann. § 6–2–106(a) are not sufficiently identical to part of the elements of Wyo. Stat. Ann. § 6–2–106(b)(i) ("under the influence" aggravated vehicular homicide) to qualify it as a lesser-included offense. The putative lesser offense requires proof of criminal negligence and expressly precludes admitting evidence of specific driving under the influence violations, while the greater offense requires proof of those specific driving under the influence violations and that such a violation be the proximate cause of the victim's death.

[¶ 55] In the instant case, appellant was charged alternatively with aggravated vehicular homicide under Wyo. Stat. Ann. § 6–2–106(b)(i) and/or (b)(ii), and the district court instructed the jury on the elements of both

subsections. Because the jury entered separate "guilty" findings to each charge under both subsection (b)(i) and subsection (b)(ii), there being sufficient evidence to sustain a conviction under either subsection,[13] any potential ineffectiveness of counsel in failing to request a lesser-included offense instruction as to subsection (b)(ii) does not prejudice appellant's conviction pursuant to subsection (b)(i); appellant was not entitled to such an instruction under subsection (b)(i).

[¶ 56] In *Balsley*, 668 P.2d at 1327–28, this Court (utilizing a test later modified by *State v. Keffer*, 860 P.2d 1118, 1134–36 (Wyo. 1993)) analyzed a prior version of the statute. At that time, homicide by vehicle was committed by

"[w]hoever, except when the violation of law involves culpable neglect or criminal carelessness, unlawfully and unintentionally, but with a conscious disregard of the safety of others, causes the death of another person while engaged in the violation of any state law or ordinance applying to the operation or use of a vehicle or to the regulation of traffic, except those laws or ordinances relating to conduct set forth in subsection (a) [aggravated vehicular homicide]. . . ."

*Balsley*, 668 P.2d at 1325. The aggravated vehicular homicide statute provided that

"[w]hoever, while driving any vehicle under the influence of either intoxicating liquor or a controlled substance, or a combination of both, to a degree which renders him incapable of safely driving a vehicle, causes the death of another person shall be

---

**12.** The appellant in *Candelaria*, 895 P.2d at 436, was charged with violating Wyo. Stat. Ann. § 6–2–106(b)(ii) (Supp.1994) (reckless aggravated vehicular homicide). The district court instructed the jury on the elements of reckless aggravated vehicular homicide and criminally negligent vehicular homicide, and the jury convicted Candelaria of criminally negligent vehicular homicide. *Id.* at 436, 438 n. 3. We found that the district court "accurately" instructed on the elements of both offenses, but in the context of an argument not involving the lesser-included offense issue. *Id.* at 438. We also recognize that in the instant case, where the evidentiary basis for appellant's recklessness under Wyo. Stat. Ann. § 6–2–106(b)(ii) is primarily his "under the influence" status (evidence of which is not admissible to

prove the elements of Wyo. Stat. Ann. § 6–2–106(a)), it might be argued (absent additional evidence—*see Candelaria*, 895 P.2d at 435–36, 436–37 n. 2) that appellant was not entitled to a lesser-included offense instruction under Wyo. Stat. Ann. § 6–2–106(b)(ii) because there was insufficient evidence that would justify a conviction of the lesser-included offense.

**13.** Appellant only contests the sufficiency of the evidence as to the causation element in relation to Mary Fink's death. We have found that the evidence was sufficient to sustain appellant's conviction as to that element, and appellant does not argue that the evidence was insufficient ·in any other respect.

guilty of aggravated homicide by vehicle...."

*Id.* The appellant in *Balsley* was charged with what is now "under the influence" aggravated vehicular homicide. *Id.* at 1324. The state offered a lesser-included offense instruction based essentially on what is now reckless aggravated vehicular homicide, which the district court accepted, and the appellant was convicted of the putative lesser-included offense. *Id.* at 1325–27. This Court reversed, finding that the elements of the two offenses were not sufficiently identical for the putative lesser-included offense to qualify as such. *Id.* at 1327–29. This finding does not conflict with our holding herein; it is consistent with our conclusion that criminally negligent vehicular homicide is not a lesser-included offense of "under the influence" aggravated vehicular homicide and, given the current statutory framework and definitions of "criminal negligence" and "recklessly," the question as to whether criminally negligent vehicular homicide is a lesser-included offense of reckless aggravated vehicular homicide constitutes an entirely different issue.

[¶ 57] The appellant in *Bloomquist*, 914 P.2d at 819, was charged alternatively with violating Wyo. Stat. Ann. § 6–2–106(b)(i) and/or (b)(ii) (Supp.1995), and sufficient evidence had been introduced to sustain a conviction under either subsection. Bloomquist argued that his counsel was ineffective in not requesting a lesser-included offense instruction pursuant to Wyo. Stat. Ann. § 6–2–106(a). *Bloomquist*, 914 P.2d at 822. We held that the defense's theory was that Bloomquist's driving was not the proximate cause of the victim's death and that the decision to not request a lesser-included offense instruction was therefore a sound tactical decision; the proposed instruction would have undermined the defense's theory and the instruction would not have aided the defense because the evidence of Bloomquist's recklessness was so overwhelming that a reasonable jury could not have convicted him of criminal negligence. *Id.* This holding does not dictate a particular result in the instant case nor is it inconsistent with our findings herein.

### SUFFICIENCY OF THE EVIDENCE

[¶ 58] Appellant contends that the evidence was not sufficient for a jury to infer beyond a reasonable doubt that his conduct caused Mary Fink's death. Due to Mary Fink's pre-existing risk factors for developing blood clots, the coroner's testimony as to several "possibilities" regarding the development of Mary Fink's blood clot, and the potential intervening cause of her treating physicians' conduct, appellant argues that the evidence was insufficient to sustain his convictions. Appellant does not challenge the sufficiency of the evidence as to any other element of this conviction or the conviction pertaining to Albert Fink.

When reviewing an appeal based on sufficiency of the evidence, we view the evidence, and any applicable inferences based on the evidence, in a light most favorable to the State. *Nixon v. State*, 994 P.2d 324, 329 (Wyo.1999); and *see Pool v. State*, 2001 WY 8, 17 P.3d 1285 (Wyo.2001). In conducting such a review, we do not substitute our judgment for that of the jury; rather, we determine whether a quorum of reasonable and rational individuals would, or even could, have found the essential elements of the crime were proven beyond a reasonable doubt. *Id.*

*McFarlane v. State*, 2001 WY 10, ¶ 4, 17 P.3d 31, 32 (Wyo.2001). Even though it is possible to draw other inferences from the evidence which has been presented, the jury has the responsibility to resolve conflicts in the evidence. *Bloomquist*, 914 P.2d at 824. We incorporate our prior discussion herein on the legal standard for "proximate cause."

[¶ 59] After ankle surgery on May 6, 1999, Mary Fink experienced dizziness at the hospital on May 7, 1999, and died. The hospital's pathologists performed an autopsy, which the coroner, Dr. Thorpen, attended. According to Dr. Thorpen, Mary Fink's cause of death was "bilateral pulmonary emboli," or blood clots "which form in the different parts of the body, primarily the deep veins of the lower extremities and the pelvis." Blood clots age without producing symptoms until a part, or the entire clot, breaks off, travels up the venous system to the heart, and lodges in the pulmonary artery. On May 7, 1999, a

blood clot (or pieces of the clot) the diameter of an adult thumb—an inch or greater—did exactly this, causing Mary Fink to immediately lose oxygen, which is "not survivable."

[¶ 60] One can estimate a clot's age by utilizing its microscopic characteristics as a "guideline." After examining slides of Mary Fink's blood clot, Dr. Thorpen agreed with the hospital pathologist that the clot "could have happened at any time but most particularly probably in the one to two weeks following the accident." He stated repeatedly that the clot was "one to two weeks or older," five days old at a minimum, but acknowledged that it was "possible" that the clot could have been a month old, "possible" that the clot could have been there "already," and "possible" that the "thromboembolic event could have occurred anywhere at any time."

[¶ 61] Dr. Thorpen conducted a complete review of Mary Fink's medical records and medical history. In speaking with her family, he could find no previous history of "a blood clot in the lower extremities." A "major" risk factor for developing blood clots is a blunt force injury or fracture to the lower extremities. In addition, Mary Fink was immobilized with some sort of orthopedic device and advised not to exercise or move that extremity, immobilization being an additional risk factor for developing clots. Dr. Thorpen characterized Mary Fink's ankle fracture as "considerable." Such an injury disrupts a vein's lining, slows blood flow to that area, and a clot begins to develop. According to Dr. Thorpen, the body's natural mechanism to dissolve clots likely failed Mary Fink due to the leg trauma and resulting damage to her veins.

[¶ 62] As far as other relevant risk factors, Dr. Thorpen did observe that Mary Fink was obese and fifty-five years of age (risk of developing blood clots in the leg rises with each decade of life). Inherited factors such as hypercoagulability might also contribute to developing blood clots, but testing must be done while a person is still alive, and the medical history obtained by Dr. Thorpen did not indicate the presence of hypercoagulability.

[¶ 63] Dr. Thorpen reviewed the "operative" reports regarding Mary Fink's ankle surgery, which "appeared to go well," but he did not know why the surgery was not performed immediately. When asked, based on Mary Fink's age and the presence of obesity, recent trauma or injury, and immobilization, whether it was "foreseeable that something like this could happen when surgery is slated," Dr. Thorpen replied, "[n]ot in this case" and reiterated that "the blood clot was present, you know, prior to the surgery."

[¶ 64] Dr. Thorpen opined that, from a medical standpoint, Mary Fink's ankle fracture "was the beginning of" the process which led to her blood clots, and once that process began, it led directly to her death. He testified that it was "possible but not likely" that Mary Fink could have "had the pulmonary thromboembolism without this accident ever occurring," but saw no evidence to suggest it in this case, characterizing the proposition as speculative. Dr. Thorpen felt the ankle fracture was clearly the "most significant" risk factor-it causes damage to a vein or veins, slows blood flow, implicates immobilization, and enhanced the other preexisting risk factors (age, obesity). Dr. Thorpen testified:

> Q. But in your medical opinion, would she have suffered this embolism without the fractured ankle?
>
> A. I would have to say it's possible.
>
> Q. Do you see any evidence to suggest that that is what occurred?
>
> A. No, sir, I don't.
>
> Q. And when we look solely at evidence and not speculation and possibilities, is there any other cause for that clot?
>
> A. In my opinion, no.

[¶ 65] We find that, based on Dr. Thorpen's testimony, which is uncontradicted in the record, and its inferences when viewed in a light most favorable to the State, a rational jury could conclude beyond a reasonable doubt that appellant's conduct was the proximate cause of Mary Fink's death. Dr. Thorpen's testimony, when viewed in this fashion, established that, based on the evidence (including the autopsy, scientific evidence, and a complete review of Mary Fink's medical records and medical history), as opposed to other speculative "possibilities," the ankle

fracture Mary Fink suffered in the collision with appellant's vehicle resulted in trauma to a vein or veins in her lower extremity. Due to this injury, blood flow slowed in the damaged area, Mary Fink was immobilized, and a clot developed within five days to one or two weeks prior to her ankle surgery, but nevertheless after the collision with appellant's vehicle. The fracture was the "most significant" factor in the clot's development, enhancing Mary Fink's pre-existing risk factors for developing clots. Sometime on May 7, 1999, the clot broke away and caused Mary Fink's death. The record is insufficient, in this context, to establish an intervening cause based on the conduct of Mary Fink's treating physicians (the only basis relied upon in appellant's argument). Dr. Thorpen rendered his opinion (again uncontradicted in the record) based on his review of Mary Fink's medical records, medical history, and operative reports relating to her ankle surgery; he did not know why the ankle surgery was not performed immediately and stated that it was not foreseeable in this case that something "like this could happen when surgery is slated."

[¶ 66] In light of this finding, the district court similarly did not err in denying appellant's motion for a judgment of acquittal.

**HEARSAY TESTIMONY**

[¶ 67] Appellant argues that the district court erred in allowing the State's accident reconstruction expert to testify regarding statements attributed to Heather Johnson because the witness testified that the statements "corroborated" his findings; therefore, the statements did not form the basis for his expert opinion and should have been excluded. Additional argument pertaining to Heather Johnson's videotaped statement is essentially moot in light of this Court's denial of appellant's motion to supplement the record with the videotaped statement.

[¶ 68] Determinations with respect to the admissibility of evidence are vested within the sound discretion of the trial court, and we do not disturb those rulings on appeal absent a clear abuse of discretion. *Russell v. State*, 851 P.2d 1274, 1281 (Wyo.1993).

"[T]he core of our inquiry must reach 'the question of reasonableness of the choice made by the trial court.' *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998). 'Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.' *Id.* (quoting *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236, 1238 (1985)); *Basolo [v. Basolo]*, 907 P.2d [348] at 353 [ (Wyo. 1995) ]. We must ask ourselves whether the district court could reasonably conclude as it did and whether any facet of its ruling was arbitrary or capricious."

*Young v. HAC, LLC*, 2001 WY 50, ¶ 6, 24 P.3d 1142, 1144 (Wyo.2001) (quoting *Carlton v. Carlton*, 997 P.2d 1028, 1031 (Wyo.2000)). In this respect, we give considerable deference to the trial court's rulings. *Griswold v. State*, 994 P.2d 920, 927 (Wyo.1999).

[¶ 69] Officer Dye testified for the State as an expert witness in accident reconstruction. Officer Dye had been a peace officer for twenty-four years with 250 hours "in advanced training in DUI detection and apprehension," conducted in excess "of 500, 600" DUI arrests (thirty to forty percent of which arrests involved a "crash"), and received additional training, experience, and provided expert testimony in accident reconstruction. Officer Dye testified as follows:

Q. Now, as to the result and processes you're going to use here today, the theories and the experimentation you do, have those theory techniques been tested and found to be accurate within your field?

A. Yes, sir, they have.

* * *

Q. Have other accident reconstructionists found these techniques you are going to testify to be accurate, to produce accurate results?

A. Yes, they have, sir.

Q. Are they commonly accepted in the accident reconstructionist community as producing accurate results?

A. Yes, sir.

* * *

A. When you perform a reconstruction, sir, what you're trying to do is gain the most complete picture that is possible of what actually happened during the crash. I reviewed the physical evidence at the scene. I reviewed physical evidence from the motor vehicles. I reviewed the statements from everyone involved in the actual crash, any eyewitnesses to the crash. You put all of those things together and build a complete picture.

If the physical evidence leads me to a conclusion and the eyewitness statements lead me to another conclusion, then I would realize that I have to rework my scenario, my theories and my opinions, but if they all work together and corroborate each other, basically it's a double-check on my work, my physical work with the scene and the vehicles, corroborating that with the statements. It ensures that my work is as accurate as possible, sir.

Q. While you use the statements for corroboration, do you rely primarily on statements or on your physical observation and testing and the physical facts of the test?

A. I rely primarily on the physical evidence at the scene and testing that I can do at the scene, time-and-distance studies or perception analysis, but those are what I rely primarily upon, but again, I always fall back on the statements to corroborate those.

\* \* \*

Q. . . . . You had indicated statements are corroborative in reaching your opinions. Is the manner in which an individual is driving a vehicle immediately before the accident something that's relevant to your considerations?

A. Yes, sir, it is.

Q. In this instance, did you collect that information yourself?

A. Yes, I did.

\* \* \*

Q. Did you find it sufficiently reliable to make it part of your review?

A. Yes, I did.

\* \* \*

Q. Again, are all those sorts of reports—do they corroborate everything you're finding at the scene physically and all the other evidence you're finding?

A. Yes, sir, they do.

The testimony at issue occurred after Officer Dye detailed the physical evidence at the scene (including photographs and a scale diagram of the scene he produced based on the physical evidence), what that evidence indicated in terms of how the collision occurred, and the scientific testing he performed (time and distance calculations regarding each vehicle's visibility and reaction time, etc.):

Q. Could you ever find any reason on the roadway or any reason in the reconstruction why he cut that corner and left his lane 23 feet or 20, 25 feet from the intersection itself?

A. No, sir. I could find no obstructions, no reason that the vehicle could not attempt to negotiate the turn in a lawful fashion.

Q. You indicated you had dealt with hundreds of DUI's. Such steering maneuvers or turning maneuvers, are they common in impaired drivers?

A. Yes, sir, they are.

Q. What other difficulties do impaired drivers have, in your experience?

A. That's a very all-encompassing question, sir. In 23 years of law enforcement, I've seen impaired drivers do a lot of things, but most commonly, they have perception problems. They will run stop signs, run red lights. It's—one of the most common things that causes an impaired driver to be stopped by a law enforcement officer is weaving in his lane, crossing the yellow line, entering into a parking—crossing a fog line into a parking area and driving their motor vehicle not within its lane of travel.

Q. From all the information you observed, had the Allen vehicle had trouble maintaining its lane of travel before the turn was attempted?

A. Yes, it did.

Q. What sort of difficulty?

A. One of the statements I reviewed—

[DEFENSE COUNSEL]: Objection, Your Honor.

Officer Dye then testified that according to Heather Johnson, who was seated in the back seat of the station wagon, the "Allen vehicle had crossed the centerline on two prior occasions before the turn was executed" and that Heather Johnson saw the Finks' vehicle and "warned the driver of the Fink vehicle" or "told him to look out for that car." According to Officer Dye, Heather Johnson also stated that Frank Allen had "warned him twice." Officer Dye ultimately offered the following opinion:

> Q. Based upon all the physical testing, reviews you've done, the eyewitness statements you've looked at and all the things you've talked about here today, do you have an opinion as to what caused this motor vehicle wreck?
>
> A. Yes, sir, I do.
>
> Q. And what is that opinion?
>
> A. I believe that the Allen vehicle was executing a left-hand turn in an illegal manner across the path of the Fink vehicle, that the driver of the Allen vehicle could have and should have observed the imminent hazard that the Fink vehicle presented to it as it executed that turn. And I also believe the reason that he did not react was due to his intoxication.

[¶ 70] Officer Dye's testimony was admissible under W.R.E. 703, which states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Out-of-court statements by a third party ordinarily are inadmissible to prove the truth of the matter asserted, but may be admissible to show the basis of an expert's opinion so long as other experts in the field would rely on similar evidence. *Griswold*, 994 P.2d at 927. Appellant does not argue that the State improperly utilized the statements once they were admitted or that, based on Officer Dye's testimony, other experts in the field would not rely upon the statements in forming opinions or inferences on the subject.

[¶ 71] The district court did not abuse its discretion in allowing Officer Dye to testify to Heather Johnson's statements. The statements clearly formed the basis for, and were relevant to, Officer Dye's opinion that appellant did not perceive or react to the Finks' vehicle in turning across the westbound lane of travel due to his intoxicated state, and also to some degree formed the basis for, and were relevant to, Office Dye's opinion regarding the complete picture of precisely how the collision occurred.

[¶ 72] Appellant further asserts that the district court erred in allowing Tina Evans to testify that Heather Johnson stated, "I told [appellant] to watch out for that car." Appellant has not presented cogent argument or cited to pertinent authority in advancing this argument, and we therefore summarily affirm the district court on this issue. *Basolo v. Gose*, 994 P.2d 968, 970 (Wyo.2000).

**CROSS-EXAMINATION OF APPELLANT REGARDING PRIOR CONVICTIONS**

[¶ 73] Appellant argues that the district court erred in not granting his motion for a mistrial after the State asked appellant on cross-examination if he "had been convicted of felonies twice in the past." Appellant's argument emphasizes the district court's failure, once it decided to strike the question, to instruct the jury as to the "implications of what striking a question had to do with their deliberations." Regarding the mistrial motion, appellant argues that the "jury was able to follow the line of questioning which led to a deliberate question regarding inadmissible testimony which had dire implications for Appellant. Based on this alone, the district court should have granted the mistrial." Appellant does not argue that the State's question violated a pretrial order.

[¶ 74] The question at issue occurred in the following context:

> Q. You also made a statement to the paramedic that you don't use illegal drugs?
>
> A. That's correct.
>
> Q. Even though we found all this—we found this marijuana in your system?

A. That's—yeah—that is claimed, yes. But I do not—if you'd like me to clarify, I can on that.

Q. Well, do you use illegal drugs?

A. No, I do not.

Q. Did you state that to the paramedic?

A. Yes, I did.

Q. But, in fact, sir, you have been convicted of felonies twice in the past, have you not?

[DEFENSE COUNSEL]: Your Honor, may we approach?

The district court held a hearing outside the jury's presence on the admissibility of the convictions pursuant to W.R.E. 609 [14] (appellant's counsel having entered a timely objection). The parties disputed whether the convictions were more than ten years old and whether the State had provided adequate notice of its intent to use the convictions as impeachment evidence. After researching the issue, the district court ultimately decided to exclude the evidence (it was a "tough matter," a "close call in some ways") and "proceed as best I can to simply rule on the pending objection and strike the question from consideration by the jury." The district court also denied appellant's mistrial motion, and then stated in the jury's presence:

> THE COURT: When we broke, we had an objection pending, and I'm going to sustain the objection and strike the last question that was pending at the time we broke for lunch.
>
> You may proceed.

[¶ 75] The decision to grant a mistrial rests within the sound discretion of the trial court. Absent a clear abuse of discretion that prejudices the defendant, a decision not to grant a mistrial will not be reversed. *DeLeon v. State*, 894 P.2d 608, 612 (Wyo.1995). "Granting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of an error so prejudicial that justice could not be served by proceeding with trial." *Warner v. State*, 897 P.2d 472, 474 (Wyo. 1995). The trial court is in the best position to assess the prejudicial impact of such error. *Id.*

[¶ 76] The district court did act to cure any prejudice that resulted from the State's question. After hearing both parties' arguments on the merits of admitting such evidence (a "close call in some ways"), the district court sustained appellant's objection and struck the question. While it may have been advisable to give a more thorough curative instruction, and recognizing that the district court is in the best position to assess prejudicial impact, the jury was instructed at the trial's outset that if

> any evidence is admitted and afterwards is ordered by me to be stricken out, you must disregard entirely the matter thus stricken. And if any counsel intimates by any of his questions that certain hinted facts are or are not true, you must disregard any such intimation and must not draw any inference from it.

We presume that the jury followed its instructions. *Ramirez v. State*, 739 P.2d 1214, 1220 (Wyo.1987). Under these circum-

---

14. W.R.E. 609 provides, in pertinent part:

(a) *General rule.*—For the purpose of attacking the credibility of a witness,

(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one (1) year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and

(2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

(b) *Time limit.*—Evidence of a conviction under this rule is not admissible if a period of more than ten (10) years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten (10) years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

stances, the district court did not clearly abuse its discretion in denying appellant's mistrial motion.

[¶ 77] Affirmed.