2003 WY 56

**William WHEATON, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 01–6.

Supreme Court of Wyoming.

May 1, 2003.

Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Assistant Appellate Counsel, Representing Appellant. Argument by Tina Kerin.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Kimberly A. Baker; Senior Assistant Attorney General; Theodore E. Lauer, Director, Prosecution Assistance Program; and Shawn L. Barlow, Student Director, Representing Appellee. Argument Mr. Barlow.

Before HILL, C.J., and GOLDEN, LEHMAN *, and VOIGT, JJ.

HILL, Chief Justice.

[¶ 1] Appellant, William Wheaton (Wheaton), appeals from the judgment and sentence finding him guilty of causing bodily injury to a peace officer engaged in the lawful performance of his duties, and property destruction. Wheaton contends that the State engaged in misconduct when it utilized the results of a blood alcohol test which was accomplished without his consent, and that the blood test was the result of an unreasonable search and seizure. Wheaton also asserts that his arrest was unlawful and that the district court erred in instructing the jury.

[¶ 2] We will affirm.

## ISSUES

[¶ 3] Wheaton poses the issues as follows:

---

* Chief Justice at time of oral argument.

Judge Terry Rogers heard oral arguments in this matter, and the case was originally assigned to him on February 20, 2002 for the rendering of a proffered majority opinion. This case was reassigned to Chief Justice Hill on January 3, 2003. Judge Rogers did not take part in this decision.

I. Did the prosecutors commit prosecutorial misconduct when they utilized blood alcohol levels of [Wheaton] obtained without his consent?

II. Were [Wheaton's] rights, to be free from unreasonable search and seizure and to due process of law, violated by the obtaining of his blood alcohol level without his consent?

III. Was [Wheaton's] arrest unlawful?

IV. Did the trial court err in refusing [Wheaton's] proffered jury instruction regarding whether the police officer was engaged in the lawful performance of his duties?

The State outlines the issues somewhat differently:

I. Did the State commit prosecutorial misconduct when evidence of [Wheaton's] blood alcohol content was introduced at trial and reference to this evidence was made in closing argument?

II. Did the State violate [Wheaton's] constitutional rights against unreasonable searches and seizures and to due process of law when it obtained a sample of [Wheaton's] blood?

III. Did Officer Rose have reasonable and probable grounds to believe that [Wheaton] had been driving while under the influence and therefore lawfully arrest [him]?

IV. Did the trial court err when it refused to give a jury instruction relating to resisting arrest?

## FACTS

[¶ 4] On January 25, 2000, Rawlins Police Officer Michael Rose was dispatched to the scene of an accident. There were two vehicles at the scene, a pickup truck that was off the road and up against a fence, and a van that appeared to be in use to pull the pickup back onto the roadway. There were two men at the scene, Wheaton and his friend, Alexander Orloff (Orloff). The pickup belonged to Wheaton's girlfriend and the van belonged to Orloff. Officer Rose asked Wheaton if he had been driving the pickup and he responded that he had.

[¶ 5] Rose detected the smell of alcohol emanating from Wheaton and observed that he had poor balance, slurred speech, and was "emotional." Officer Rose could tell that Orloff had been drinking as well. Because he was confronted with two intoxicated men, Rose called for backup police support and, soon after his call, the Rawlins Chief of Police and two other Rawlins police officers arrived on the scene. Officer Rose again asked Wheaton if he had been driving the pickup and Wheaton pointed to his dog. The dog was loose and running around the scene of the accident. Rose again asked Wheaton who was driving the pickup, and this time Wheaton pointed to the Rawlins Police Chief. Based upon Wheaton's initial admission that he had been driving the pickup which belonged to his girlfriend, the fact that there were two people present and two vehicles, the fact that Wheaton was obviously intoxicated, and Wheaton's refusal to perform field sobriety maneuvers or do a breathalyzer test (Alcosensor), Officer Rose determined that Wheaton should be arrested for driving while under the influence (DWUI).

[¶ 6] After being handcuffed, Wheaton became combative when Officer Rose attempted to do a pat down search on Wheaton before placing him in the police car. It took two police officers to complete the pat down search and get Wheaton into the police car. Wheaton expressed concern about his dog and Officer Rose told him he would call animal control to have the dog picked up. With Wheaton in the back seat of Officer Rose's patrol car, the police officers turned their attention to Orloff.

[¶ 7] At this point, Wheaton, who was lying on the back seat of the patrol car, began kicking the right rear window of the vehicle. Wheaton also was screaming that the police were going to kill his dog. In his testimony at trial, Wheaton testified that Officer Rose threatened to shoot his dog and/or send it to the pound to be put to sleep. Officer Rose denied making any such threats and another police officer corroborated that testimony. An audio/video tape made at the scene did not reveal any such threat. Orloff did corroborate Wheaton's testimony in this regard. In any event, Wheaton's dog was

taken to the pound and he was able to get it back the day after his arrest, which was what Officer Rose testified that he told Wheaton would happen.

[¶ 8] Wheaton continued kicking the patrol car's rear window until it finally shattered. Wheaton was placed in leg chains, his feet were secured to the floor of the patrol car, and he was then driven to the county jail. Because of the difficulties at the accident scene, two deputy county sheriffs and a state trooper were called to assist, and they followed Officer Rose to the county jail to help him with the combative Wheaton. Four police officers, including Officer Rose, were involved in moving Wheaton from the back seat of Rose's car and into the jail. Once out of the patrol car, Wheaton screamed out Officer Rose's name ("that f——ing Rose") and then reared backwards striking Rose in the forehead with the back of his head. Rose suffered serious injuries as a result of that attack. Wyo. Stat. Ann. § 6–5–204 (Lexis-Nexis 2001) (emphasis added) provides:

§ 6–5–204. **Interference with peace officer; disarming peace officer; penalties.**

(a) A person commits a misdemeanor punishable by imprisonment for not more than one (1) year, a fine of not more than one thousand dollars ($1,000.00), or both, if he knowingly obstructs, impedes or interferes with or resists arrest by a peace officer while engaged in the lawful performance of his official duties.

(b) **A person who intentionally and knowingly causes or attempts to cause bodily injury to a peace officer engaged in the lawful performance of his official duties is guilty of a felony punishable by imprisonment for not more than ten (10) years.**

(c) A person who intentionally and knowingly disarms a peace officer of his firearm while that peace officer is engaged in the lawful performance of his official duties is guilty of a felony punishable by imprisonment for not more than five (5) years.

[¶ 9] Wheaton also caused significant damage to Officer Rose's police car, including a broken window and window run channel, and a torn fabric head liner, at a total cost of $1,489.27. Wyo. Stat. Ann. § 6–3–201 (LexisNexis 2001) (emphasis added) provides:

§ 6–3–201. **Property destruction and defacement; grading; penalties; aggregated costs or values.**

(a) **A person is guilty of property destruction and defacement if he knowingly defaces, injures or destroys property of another without the owner's consent.**

(b) Property destruction and defacement is:

(i) A misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both, if the cost of restoring injured property or the value of the property if destroyed is less than five hundred dollars ($500.00);

(ii) Repealed by Laws 1985, ch. 44, § 2.

(iii) **A felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,000.00), or both, if the cost of restoring injured property or the value of the property if destroyed is five hundred dollars ($500.00) or more.**

(c) If a series of injuries results from a single continuing course of conduct, a single violation of this section may be charged and penalties imposed based upon the aggregate cost or value of the property injured or destroyed.

[¶ 10] A focal point of Wheaton's defense was that he was not driving at the time he was arrested, so there did not exist probable cause to arrest him for DWUI. Indeed, the record is clear that Wheaton was not actually driving at the time Officer Rose came upon the scene of the accident. Wyo. Stat. Ann. § 31–5–233 (LexisNexis Supp.2002) (emphasis added): [1]

---

**1.** The statute has been amended since the time of Wheaton's arrest, but not in a manner that af-

fects our disposition of this case.

§ 31-5-233. **Driving or having control of vehicle while under influence of intoxicating liquor or controlled substances; penalties.**

(a) As used in this section:

(i) "Alcohol concentration" means:

(A) The number of grams of alcohol per one hundred (100) milliliters of blood;

(B) The number of grams of alcohol per two hundred ten (210) liters of breath; or

(C) The number of grams of alcohol per seventy-five (75) milliliters of urine.

(ii) "Controlled substance" includes:

(A) Any drug or substance defined by W.S. 35-7-1002(a)(iv);

(B) Any glue, aerosol or other toxic vapor which when intentionally inhaled or sniffed results in impairment of an individual's ability to drive safely.

(iii) "Conviction" means as defined in W.S. 31-7-102(a)(xi);

(iv) "Driver's license" means as defined in W.S. 31-7-102(a)(xxv) and includes nonresident operating privileges as defined in W.S. 31-7-102(a)(xxx);

(v) "Other law prohibiting driving while under the influence" means a statute of another state, the United States or a territory or district of the United States or an ordinance of a governmental entity of this or another state or of an Indian tribe which prohibits driving while under the influence of intoxicating liquor, alcohol, controlled substances or drugs.

(b) **No person shall drive or have actual physical control of any vehicle within this state if the person:**

(i) **Has an alcohol concentration of eight one-hundredths of one percent (0.08%) or more; or**

(ii) **To a degree which renders him incapable of safely driving:**

(A) **Is under the influence of alcohol;**

(B) Is under the influence of a controlled substance; or

(C) Is under the influence of a combination of any of the elements named in subparagraphs (A) and (B) of this paragraph.

(c) Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or being in actual physical control of a vehicle while under the influence of alcohol, the amount of alcohol in the person's blood at the time alleged as shown by chemical analysis of the person's blood, urine, breath, or other bodily substance shall give rise to the following presumptions:

(i) If there was at that time an alcohol concentration of five one-hundredths of one percent (0.05%) or less, it shall be presumed that the person was not under the influence of alcohol;

(ii) If there was at that time an alcohol concentration of more than five one-hundredths of one percent (0.05%) and less than eight one-hundredths of one percent (0.08%), that fact shall not give rise to any presumption that the person was or was not under the influence of alcohol, but it may be considered with other competent evidence in determining whether the person was under the influence of alcohol to a degree which renders him incapable of safely driving a motor vehicle.

(d) **Subsection (c) of this section shall not be construed as limiting the introduction of any other competent evidence bearing upon the question of whether the person was under the influence of alcohol, including tests obtained more than three (3) hours after the alleged violation. The fact that any person charged with a violation of subsection (b) of this section is or has been entitled to use the controlled substance under the laws of this state shall not constitute a defense against any charge under subsection (b) of this section.**

(e) Except as provided in subsection (h) of this section, a person convicted of violating this section is guilty of a misdemeanor

punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both. On a second conviction within five (5) years after a conviction for a violation of this section or other law prohibiting driving while under the influence, he shall be punished by imprisonment for not less than seven (7) days nor more than six (6) months and shall not be eligible for probation or suspension of sentence or release on any other basis until he has served at least seven (7) days in jail. In addition, the person may be fined not less than two hundred dollars ($200.00) nor more than seven hundred fifty dollars ($750.00). On a third or subsequent conviction within five (5) years after a conviction for a violation of this section or other law prohibiting driving while under the influence, he shall be punished by imprisonment for not less than thirty (30) days nor more than six (6) months and shall not be eligible for probation or suspension of sentence or release on any other basis until he has served at least thirty (30) days in jail. The court, after consultation with the sheriff, may order the person to undergo outpatient alcohol or substance abuse treatment during any mandatory period of incarceration. The minimum period of imprisonment for a third or subsequent violation shall be mandatory, but the court may suspend up to fifteen (15) days of the mandatory period of imprisonment if, subsequent to the date of the current violation, the offender completes an inpatient treatment program approved by the court. In addition, the person may be fined not less than seven hundred fifty dollars ($750.00) nor more than three thousand dollars ($3,000.00). The judge may suspend part or all of the discretionary portion of an imprisonment sentence under this subsection and place the defendant on probation on condition that the defendant pursues and completes an alcohol education or treatment program as prescribed by the judge. Notwithstanding any other provision of law, the term of probation imposed by a judge under this section may exceed the maximum term of imprisonment established for the offense under this subsection provided the

term of probation together with any extension thereof, shall in no case exceed three (3) years.

(f) Any person convicted under this section or a municipal ordinance which substantially conforms to the provisions of this section shall, in addition to the penalty imposed, have his driver's license suspended or revoked pursuant to W.S. 31–7–127 or 31–7–128. The court shall forward to the department a copy of the record pertaining to disposition of the arrest or citation.

(g) The court may, upon pronouncement of any jail sentence under subsection (e) of this section, provide in the sentence that the defendant may be permitted, if he is employed or enrolled in school and can continue his employment or education, to continue such employment or education for not more than the time necessary as certified by his employer or school administrator, and the remaining day, days or parts of days shall be spent in jail until the sentence is served. He shall be allowed out of jail only long enough to complete his actual hours of employment or education and a reasonable time to travel to and from his place of employment or school. Unless the defendant is indigent, the court shall require him as a condition of special treatment under this subsection to pay a reasonable amount for room and board as determined by the sheriff.

(h) As used in this subsection, "serious bodily injury" means bodily injury which creates a reasonable likelihood of death or which causes miscarriage or serious permanent disfigurement or protracted loss or impairment of any bodily member or organ. Whoever causes serious bodily injury to another person resulting from the violation of this section shall be punished upon conviction as follows:

(i) If not subject to the penalty under paragraph (ii) of this subsection, by a fine of not less than two thousand dollars ($2,000.00) nor more than five thousand dollars ($5,000.00), imprisonment for not less than six (6) months nor more than one (1) year, or both;

(ii) If previously convicted and sentenced under this subsection, or any other law substantially conforming to the provisions of this subsection, by imprisonment for not more than twenty (20) years; and

(iii) Any person convicted under this subsection shall have his driver's license revoked as provided in W.S. 31–7–127.

(j) Any person charged under this section or a municipal ordinance which substantially conforms to the provisions of this section shall be prosecuted under this section or the ordinance and not under a reduced charge or dismissed unless the prosecuting attorney in open court moves or files a statement to reduce the charge or dismiss, with supporting facts, stating that there is insufficient evidence to sustain the charge.

(k) Chemical analysis of a person's blood, breath or urine to determine alcohol concentration or controlled substance content shall be performed in accordance with W.S. 31–6–105(a).

[¶ 11] Wyo. Stat. Ann. § 31–6–102(d) (LexisNexis Supp.2002) provides: "If a person under arrest refuses upon the request of a peace officer to submit to a chemical test designated by the agency employing the peace officer as provided in subsection (a) of this section, none shall be given except in cases where serious bodily injury or death has resulted." Although Wheaton refused to submit to a chemical test, and there was no apparent basis for the "serious bodily injury or death" exception, Wheaton was subjected to a blood test which revealed his blood alcohol concentration to be .19%. A Rawlins police officer testified that it was "normal practice to get a blood alcohol level in any assault case where alcohol may be a factor." There was no objection made to the admission of the blood alcohol test. Wheaton was charged with DWUI, but at his trial in the county (now circuit) court on that charge, the blood test evidence was suppressed on the basis of § 31–6–102(d). Ultimately, Wheaton was acquitted of the DWUI charge.

[¶ 12] Wheaton asks that we take judicial notice of a transcript of the proceedings from his DWUI trial in the Circuit Court. Wheaton offers no satisfactory explanation why the transcript was not offered to the trial court or why no effort was made to supplement the record on appeal through use of the applicable rules of appellate procedure. More importantly, we have carefully examined that transcript and determined that it is of no material assistance to this Court in resolving the issues presented by the appeal. Therefore, we decline to take judicial notice of it. *See 37 Gambling Devices (Cheyenne Elks Club and Cheyenne Music and Vending, Inc.) v. State*, 694 P.2d 711, 716–17 (Wyo.1985).

### DISCUSSION

**Prosecutorial Misconduct and Reasonableness of Search**

[¶ 13] Wheaton contends that the prosecutor committed an act of misconduct by advancing the admission of the blood alcohol test done on Wheaton. At trial Wheaton made no objection to the admission of the blood alcohol test. Wheaton's argument is based on a theory that Wyo. Stat. Ann. § 31–6–102(d) prohibited the use of a blood alcohol test because Wheaton refused the test and "serious bodily injury or death" were not a factor in his case. The record in this case is clear, without need for reference to the proceedings at Wheaton's DWUI trial, that the blood alcohol test was not admitted at that trial because Wheaton refused the test and, thus, it could not be used *in his DWUI trial.* However, § 31–6–102(d) applies only to a DWUI situation and, thus, it does not answer the question of whether or not it was admissible under the circumstances of the instant charges in this trial.

[¶ 14] Whether or not the blood test should have been admitted in this case was not called to the trial court's attention and, thus, that issue was not explored below. Wheaton contends that the State made much ado about his intoxication, and that is essentially correct, though we will not detail each and every such reference made by the State. For purposes of our analysis here, we are more concerned with the use Wheaton made of that evidence. During voir dire, Wheaton's attorney emphasized that his client had

been drinking, and in opening statement emphasized that he had been "drinking quite a bit." The record is replete with testimony concerning Wheaton's state of intoxication, including his admission on cross-examination that his blood alcohol was .19%. It is readily evident that a part of Wheaton's trial strategy was that he was intoxicated and the unlawful actions of the police pushed him into a rage that justified his actions. A third part of his strategy was one he referred to as the "blue wall," *i.e.*, that the police were unified in telling lies to justify their actions.

[¶ 15] Because no objection was made to the admission of the blood alcohol test, Wheaton asks that we review this asserted error under the plain error doctrine. Plain error exists when: (1) the record is clear about the incident alleged as error; (2) there was a transgression of a clear and unequivocal rule of law; and (3) the party claiming the error was denied a substantial right which materially prejudiced him. *Weidt v. State,* 2002 WY 74, ¶ 14, 46 P.3d 846, ¶ 14 (Wyo.2002). The record clearly demonstrates that the blood alcohol test was admitted, but Wheaton does not, and cannot, point to a clear and unequivocal rule of law that was transgressed. The blood alcohol test was not admissible in a DWUI prosecution, but that does not necessarily prohibit its admission for another purpose. *See Allen v. State,* 2002 WY 48, ¶¶ 22–25, 43 P.3d 551, ¶¶ 22–25 (Wyo.2002). Wheaton was under arrest and, in addition to a DWUI charge, he was also charged with two other discrete felonies as set out above. A police officer testified that it was a policy of the Rawlins police department to obtain a blood test in cases involving assault. That policy is not fleshed out by the record, but the Fourth Amendment does not prohibit blood testing on the basis that it is inherently an unreasonable search. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); 2 Wayne R. LaFave, *Search and Seizure,* § 4.1(e), at 412–13 (1996); 3 Wayne R. LaFave, *Search and Seizure,* § 5.3(c) at 130–45 (1996); Vitauts M. Gulbis, Annotation, *Admissibility in Criminal Case of Blood–Alcohol Test where Blood was Taken Despite Defendant's Objection or Refusal to Submit to Test,* 14 A.L.R.3d 690 (1982 and Supp.

2001). There is no "bright line" which sets out the limits on the taking of a blood test, but this excerpt from Professor LaFave's treatise provides guidance:

As for the taking of a blood sample from an arrested person, it is necessary under *Schmerber* that the test be "a reasonable one" and that it be "performed in a reasonable manner." Given the objective of determining if the defendant was intoxicated, the Court deemed the taking of the sample to be a reasonable means of accomplishing that purpose. And because the "blood was taken by a physician in a hospital environment according to acceptable medical practices," the test was performed reasonably. It is also necessary under *Schmerber* that there be "a clear indication that in fact [the evidence sought] will be found" as "the Fourth Amendment [forbids] any such intrusion on the mere chance that desired evidence might be obtained." Whether this "clear indication" requirement is somewhat more demanding that the usual probable cause requirement is a matter of continuing uncertainty, but it can be forcefully argued that it is. In any event, the test was met in *Schmerber,* for defendant's condition "suggested the required relevance and likely success of a test of petitioner's blood for alcohol." As for exigent circumstances, the Court in *Schmerber* concluded that while a search warrant is ordinarily required "where intrusions into the human body are concerned," no warrant was needed under the facts presented because the officer quite reasonably believed there was a need to take the test before the percentage of alcohol in the blood diminished. This means, of course, that if the purpose of the test were merely to determine the arrestee's blood type, then a search warrant would be required. Because "*Schmerber* viewed the seizure and separate search of the blood as a single event for Fourth Amendment purposes," exigent circumstances need exist only as to the blood removal, and if they exist no warrant is required even though the removed sample need not be immediately tested.

3 LaFave, *supra,* § 5.3(c) at 136–39.

[¶ 16] In this case, the record does reflect that the blood test was taken by a

trained person in the county jail, rather than a doctor in a hospital, but given Wheaton's failure to further develop the record in that regard, we need not attempt to definitively answer the question of whether this test was "reasonable." Had an objection been lodged, it would have been the State's burden to clearly demonstrate the reasonableness of the test. However, we do conclude that the taking of the blood test did not violate a clear and unequivocal rule of law, for the law does allow such testing under the strictures set out above.

[¶ 17] We also note that Wheaton did not demonstrate that he was prejudiced by the admission of the blood test. Establishing the fact that he was intoxicated was a part of his trial strategy and the blood test was merely cumulative of other evidence, which clearly demonstrated that he was intoxicated. Finally, given these circumstances, we can only conclude that the prosecutor did not commit an act of misconduct.

## Was Wheaton's Arrest Unlawful

[¶ 18] Wheaton contends that his arrest was unlawful because Officer Rose lacked probable cause to arrest him for DWUI. We answered a virtually identical question very recently:

Kimsey contends that Officer Johnson lacked probable cause to arrest him for driving while under the influence because no one saw Kimsey actually driving his vehicle. WYDOT counters that Officer Johnson had reasonable grounds to believe that Kimsey drove his vehicle while intoxicated, giving him probable cause to arrest him.

The party who challenges whether the agency's decision was supported by sufficient evidence bears the burden of showing that it was not supported by such evidence. *Smith v. State ex rel. Dep't of Transp.*, 11 P.3d 931, 937 (Wyo.2000). A police officer may arrest a person without a warrant if at the time of the arrest he possesses probable cause to believe that the person has committed a crime. *Jandro v. State*, 781 P.2d 512, 517 (Wyo.1989). Probable cause exists when, given the totality of the circumstances, a prudent, reasonable, and

cautious police officer is led to believe a crime has been committed by the person who is being arrested. *Smith*, 11 P.3d at 937. Probable cause by definition involves probabilities rather than certainties. *Id.*

After analyzing the totality of the circumstances that led up to Kimsey's arrest, we hold that Officer Johnson possessed adequate probable cause to arrest Kimsey for driving while under the influence of alcohol. It took only a few minutes for Kimsey to arrive at the Law Center after he called to inquire about the condition of his wife. Officer Johnson left the building just before Kimsey arrived, and when he returned to speak with Kimsey, he noticed the vehicle in the parking lot. When Officer Johnson asked Kimsey about the truck, Kimsey admitted that it was his and that he had driven it to the Law Center, assuring Officer Johnson that he was okay to drive. Officer Johnson told Kimsey that he thought Kimsey was too intoxicated to be driving, and Kimsey again assured Officer Johnson that he was all right to drive. When Officer Johnson asked Kimsey to perform some field sobriety tests, Kimsey asked if he could just collect his wife and promised to walk home. Officer Johnson again requested Kimsey perform sobriety tests, and Kimsey replied that he did not drive the vehicle to the Law Center and that he did not know how it got there. Kimsey next gave the explanation that maybe his wife had driven the vehicle to the Law Center.

Given the confusing nature of Kimsey's statements, along with his slurred speech, instability, and the strong odor of alcohol, Officer Johnson concluded that Kimsey was intoxicated. This conclusion, coupled with the presence of Kimsey's vehicle in the parking lot, encompass the reasonable conclusion that Kimsey was intoxicated and that he had driven his vehicle to the Law Center to check on his wife.

Kimsey asserts to this court that when he told Officer Johnson he drove to the Law Center, he meant he had received a ride to the Law Center. We find it peculiar that Kimsey neither offered this excuse to any of the officers on the night he

was arrested, nor did he present any evidence at the hearing regarding the identity of the individual he claims gave him the ride.

We hold that the totality of the circumstances were adequate to cause a reasonable police officer to believe Kimsey had driven while under the influence of alcohol even though no one actually saw him driving the vehicle. Officer Johnson, therefore, possessed adequate probable cause to arrest Kimsey for driving while under the influence of alcohol.

*Kimsey v. Wyoming Department of Transportation*, 2002 WY 15, ¶¶ 15–20, 39 P.3d 425, ¶¶ 15–20 (Wyo.2002); *and see Adams v. State*, 697 P.2d 622, 624–25 (Wyo.1985) (defendant, intoxicated and asleep in vehicle, has actual physical control of vehicle).

▮ [¶ 19] Without reiterating the facts and circumstances set out in detail above, we conclude that Officer Rose had probable cause to arrest Wheaton for DWUI and, of course, the fact that he was ultimately acquitted of that charge is not an element of our analysis of the probable cause issue.

## Refusal of Proffered Instruction

▮ [¶ 20] The applicable standard of review is well-established: Jury instructions should inform the jurors concerning the applicable law so that they can apply that law to their findings with respect to the material facts, instructions should be written with the particular facts and legal theories of each case in mind and often differ from case to case since any one of several instructional options may be legally correct, a failure to give an instruction on an essential element of a criminal offense is fundamental error, as is a confusing or misleading instruction, and the test of whether a jury has been properly instructed on the necessary elements of a crime is whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed. *Mueller v. State*, 2001 WY 134, ¶ 9, 36 P.3d 1151, ¶ 9 (Wyo.2001). With specific regard to a defendant's "theory of the case" instruction we have held that:

> Due process requires the trial court to give a correct instruction to the jury that

details the defendant's theory of the case. *Blakely v. State*, 474 P.2d 127, 129 (Wyo. 1970). The instruction must sufficiently inform the court of the defendant's theory and must be supported by competent evidence. *Bouwkamp v. State*, 833 P.2d 486, 490 (Wyo.1992). A theory of the case is more than a comment on the evidence that tells the jury how to consider the evidence. *Ellifritz v. State*, 704 P.2d 1300 (Wyo. 1985). Fundamentally, the instruction must in the first instance be a proper theory of the case, or theory of defense, instruction. That is, the offered instruction must present a defense recognized by statute or case law in this jurisdiction. *Bouwkamp*, 833 P.2d at 490.

> As *Bouwkamp* explained, "[t]heory of defense instructions are to be derived from and address criminal defenses provided for by statute or acknowledged by this court." *Id.* It further noted "common-law defenses are retained unless otherwise provided by this act." *Id.* (quoting Wyo. Stat. Ann. § 6–1–102(b)). Additionally, this Court has discussed acceptable defenses, notably in *Keser v. State*, 706 P.2d 263, 269 (Wyo. 1985). See also 1 Paul H. Robinson, Criminal Law Defenses § 21, at 70 n. 1 (1984); 1 Charles E. Torcia, Wharton's Criminal Law § 39 (15th ed.1993).

> Any competent evidence is sufficient to establish a defense theory even if it consists only of testimony of the defendant. *Best v. State*, 736 P.2d 739, 745 (Wyo.1987). We view the evidence in a light favorable to the accused and the accused's testimony must be taken as entirely true to determine if the evidence is competent. *Duckett v. State*, 966 P.2d 941, 944 (Wyo.1998). Even if the court deems the evidence to be weak, or unworthy of belief, the instruction must be given if a jury could reasonably conclude the evidence supports the defendant's position. *Id.* The refusal to allow an instruction requested by the defendant when due process requires the defendant's instruction be given is reversible error per se. *Id.*

*Holloman v. State*, 2002 WY 117, ¶¶ 15–17, 51 P.3d 214, ¶¶ 15–17 (Wyo.2002).

[¶ 21] In this instance Wheaton offered the following instruction:

> The law generally does not allow a person who is arrested by a police officer to resist arrest. The law does allow a person to resist arrest if the activity of the police is so provocative that resistance is understandable. After you have consideration [*sic*] of all the facts and circumstances you may find the police officer was not engaged in the lawful performance of his duty if you find that the police activity is so provocative that the resistance by the Defendant was understandable.

[¶ 22] The district court gave the following instruction:

> You are instructed that there may be situations that police activities are so provocative and resistance so understandable that it can only be concluded that the police were not engaged in the lawful performance of their official duties and that such conduct by the officer may give rise to right of self defense, *i.e.,* a right to resist the use of excessive force.

[¶ 23] The instruction given by the district court is an improvement upon the instruction offered by Wheaton and adequately conveyed to the jury his theory of the case. *Best v. State*, 736 P.2d 739, 745 (Wyo.1987); *Roberts v. State*, 711 P.2d 1131, 1133–36 (Wyo.1985). The district court did not abuse its discretion in declining to give the instruction offered by Wheaton, in favor of the instruction that it did give.

### CONCLUSION

[¶ 24] The prosecutor did not engage in misconduct in offering Wheaton's blood alcohol test as evidence, and it was not plain error for the district court to allow its admission. The blood test performed by the State on Wheaton was not inherently an unreasonable search and seizure and, thus, did not violate Wheaton's constitutional rights. Officer Rose had probable cause to arrest Wheaton for DWUI. The instructions given by the district court were adequate. The judgment and sentence of the district court are affirmed.